**Jackson E. McVEY and H. E. Northway,** Appellants,

v.

**PHILLIPS PETROLEUM COMPANY,** Appellee.

No. 18374.

United States Court of Appeals Fifth Circuit.

March 10, 1961.

---

2. See, e. g., Waring Products Corp. v. Landers, Frary & Clark, 2 Cir., 1959, 263 F.2d 160, 165.

James H. Wright, Houston, Tex., for appellants.

F. L. Andrews, Houston, Tex., Anthony Mondello, Atty., Dept. of Justice, Washington, D. C., William B. Butler, U. S. Atty., Houston, Tex., Morton L. Hollander, Atty., Dept. of Justice, Washington, D. C., for appellee.

Before RIVES, BROWN and WISDOM, Circuit Judges.

RIVES, Circuit Judge.

This is an appeal from a judgment in a negligence action entered in accordance with the special findings of a jury.

Plaintiffs, appellants, were employed at the time of the alleged mishap in the South Houston plant of the Nuclear Products Division of M. W. Kellogg Company. Kellogg manufactured a gamma-ray projector (the "Kel-Ray projector") which was used to detect latent defects in pipe welds. The projector worked on the same principle as an X-ray machine, the rays being emitted from radioisotopes mounted in the projector. The radioisotopes were small pellets $\frac{1}{4}''$ x $\frac{1}{4}''$, which were irradiated by placing them in a nuclear reactor. Kellogg obtained the neutral pellets from an independent supplier and sent them to a nuclear reactor at Idaho Falls, Idaho, which was operated by appellee Phillips Petroleum Company under a contract with the Atomic Energy Commission. After sufficient bombardment in the re-

actor, the pellets were shipped to the Kellogg South Houston facility.

McVey was a laboratory technician and Northway the office manager of the Kellogg South Houston Nuclear Laboratory. They allege that, on or about March 13, 1957, McVey, in the presence of Northway, was opening a shipment of ten irradiated pellets which had recently arrived from Phillips' reactor, when "there was an unexpected and uncontrolled discharge of radioactive dust into the air inside the Kellogg Laboratory." Plaintiffs allege further that, as a result of this discharge, which they claim was due to negligence on the part of Phillips, they were exposed to radioactive dust, resulting in severe injuries to their respective persons.

■■ On appeal, the first point of error raised is the refusal of the district court to admit certain evidence offered in rebuttal by plaintiffs. Initially, it may be observed that questions as to order of proof are committed to the sound discretion of the trial judge.[1] And we may also note the rule that rebuttal evidence is generally admissible only to meet the evidence brought out in defendant's case in chief.[2] Thus, we start with an analysis of those portions of the case for the defendant which the proffered evidence purported to rebut.

The first witness for the defense whose testimony is relevant to our inquiry was L. T. Newby, a County Stream and Air Pollution Inspector of the State of Texas. He recalled visiting the South Houston facility on March 18, 1957, approximately five days after the alleged exposure incident involved in this case. He noted that at the time of his visit no one told him of contamination in the area. His testimony was corroborated by his cohort, Mr. Douglas. Dr. Emmert, the first of several medical witnesses, next appeared for the defense. Dr. Emmert could find no physical evidence of exposure to radiation on the part of McVey on March 13, 1957. Mr. Hawkins was the

1. See 6 Wigmore, Evidence § 1867 (1940); 88 C.J.S. Trial § 96 (1955).

2. See 6 Wigmore, Evidence § 1873 (1940); 53 Am.Jur., Trial § 121 (1945).

next witness whose testimony is relevant. He was a former office employee at the Kellogg Nuclear Laboratory, and he testified that on a day in March 1957 the alarm bell went off in the laboratory, and at that time Mr. Northway was in the office and not in the laboratory where the alleged exposure incident took place. Hawkins also testified that McVey checked himself for traces of radiation on that day in March 1957, and that he found himself contaminated. Defendant then offered as a witness one Bradley, a representative of the manufacturer of an air monitor device which was in the Kellogg hot lab in South Houston and measured radiation in the air. He testified that an alarm bell would sound when the machine registered above 2,000 counts per minute, although that level was not considered dangerous. Bradley interpreted various charts on which the air monitor recorded the level of radiation in the air. On March 13, 1957, he found a sharp rise in counts per minute from 3,000 to 8,000—an increase which would normally have set off the alarm bell. Bradley testified that this level was probably due to the fact that sources (i. e., isotopes) were being moved around. He then translated the 8,000 count per minute reading into one-third of a microcurie, which is about three times the amount of radiation given off by a wrist watch with a radium dial. On March 14, the monitor rose to a reading of 10,000 counts per minute—"typically the thing we see following a period in which these capsules have been opened and the personnel are working with them." On the basis of his readings of three charts offered in evidence, covering the periods of August 6–September 8, 1956, October 1–November 1, 1956, and March 11–April 30, 1957, Bradley estimated that the total radiation detected by the monitor was one-fortieth of "the amount that these people—that would have been marginally hazardous for these people to have breathed continuously, not only during their 40 hours a week of occupation, but 168 hours a week throughout their lives. So that a very substantial safety factor

is involved here, a very substantial safety factor." After Mr. Bradley, a Dr. Allen testified for Phillips. On the basis of his examinations of McVey and Northway following the alleged March 13, 1957 incident, Dr. Allen concluded that "there was no significant exposure to radiation * * *. They had none of the symptoms that I could refer to radiation syndrome * * *." Dr. Allen was followed by an eye specialist, Dr. Goar. He testified that, because of their shape, he did not believe the "opacities" observed in the eyes of McVey and Northway were caused by irradiation. He also noted that "severe enough radiation to produce lens changes would cause epilation, falling out of the lashes * * *." (In their case in chief, plaintiffs had put in testimony that these opacities were early radiation cataracts.) Next came Dr. Gamble, a hemotologist. On the basis of his blood studies, he found that neither Northway nor McVey were exposed to any significant amounts of radiation. Another physician, Dr. Collins, confirmed that Northway exhibited none of the symptoms of significant radiation exposure. Dr. Harris, an expert on the biological effects of radiation, confirmed this conclusion on the basis of the symptoms manifested by plaintiffs, stating that in his opinion "there was no significant radiation injury in either one of these cases." Dr. Hasterlik agreed.

In addition to this testimony, the defendant introduced the readings from each of the plaintiffs' pocket dosimeters for the week ending Friday, March 15, 1957. These meters make daily records of the amount of radioactivity to which the wearers are exposed. McVey's total exposure for the week ending March 15 was 270 milliroentgens. Northway's dosimeter recorded 45 milliroentgens for the same week. The maximum permissible weekly accumulation is 300 milliroentgens. These exposure readings were confirmed by weekly reports of exposure to radiation taken from the film badges which appellants wore. For the week ending March 15, 1957, McVey's film badge reflected exposure to 270 milli-

roentgens of radiation, Northway's to 15 milliroentgens.

■ The proffered rebuttal evidence consisted of testimony by a representative of Tracerlab, an organization specializing in the detection and measurement of radioactivity. In late April 1957, Tracerlab made an examination of the Northway and McVey residences and discovered substantial amounts of radioactivity both in their homes and on their clothing. This evidence was offered, so plaintiffs argue, to rebut the thrust of the defense which they viewed to be the claim that plaintiffs were not exposed to a *sufficient amount* of radioactivity to cause them injury. Defendant contends that this is an erroneous view of its position. Defendant's claim is that it defended on two main grounds: 1) the alleged incident on March 13, 1957 never occurred, and 2) the injuries of which plaintiffs complain are not the result of exposure to radiation. The district judge ruled in favor of the defendant. "I think the objection that it was not brought up in the defendant' (sic) case is well founded. If it was evidence that you needed to support your case-in-chief, you should have put it on before you rested." We agree with the district judge that the substance of the defense was as appellee, defendant, argues, and that the proffered evidence was not proper rebuttal. In any event, we cannot hold that the district judge abused his discretion in barring its admission.

■ Plaintiffs, appellants next charge that the district court erred in "instructing the jury to consider only appellants' exposure to radiation which occurred on March 13, 1957, and in refusing to permit the jury to consider any subsequent *exposures* to radiation proximately resulting from the incident of March 13, 1957."

The jury's question was as follows: "We wish to know under Interrogatory No. 1(a) if alleged injury must have occurred on March 13, 1957 only, or if subsequent exposures due to the March 13th incident are to be considered. C. C. Anderson, Foreman." The court invited counsels' comments and considerable discussion between bench and bar took place before the court read the following answer to the jury:

"This suit is based on an alleged incident occurring March 13, 1957 when two radioactive pellets upon opening the reactor can became pulverized and contaminated the air as radioactive dust. You should limit your consideration to the exposure to radiation on March 13, 1957 *and the injuries resulting from such exposure even though the symptoms of such exposure may have become manifest later.*

"You may not consider radiation resulting from an *incident* occurring on any other date." (Emphasis supplied.)

This answer made clear that the jury could consider all *injuries* proximately caused by the March 13 incident. It is not at all clear that in charging the jury, "You may not consider radiation resulting from an incident occurring on any other date," the judge meant to answer the question of the jury to the effect that "you may not consider subsequent exposures due to the March 13th incident." If, however, we go with the plaintiffs to the extent of so assuming, we must still hold that, under the evidence in this case, the charge was correct. Plaintiffs' complaint alleged only the one massive exposure as the direct and proximate cause of their injuries.[3] And any expo-

3. "After so irradiating such pellets, defendant Phillips Petroleum Company caused the canister containing said pellets to be shipped to the South Houston Laboratories of the M. W. Kellogg Company in Harris County, Texas, where the aforedescribed container was cut open by means of a lathe in the laboratories of the said M. W. Kellogg Company and thereafter the cap and core of such container were in the process of being removed when suddenly and without any warning whatever two of the highly radioactive pellets disintegrated into powdery dust-like particles, exploded from the core of the container, unleas-

sures subsequent to March 13 would have been due solely to the negligence of the plaintiffs, who could have been subject to continued exposure only if they had failed to decontaminate themselves in clear violation of the Kellogg safety rules or exposed themselves to a contaminated laboratory without wearing the protective garments for which Kellogg's safety rules provided.[4]

ing huge quantities of radioactive particles which projected themselves throughout the laboratory, emitting literally hundreds of billions of electrons and gamma rays which traveled at a speed of approximately 186,000 miles per second, said electrons and gamma rays bombarding and piercing the head, face and body of your plaintiffs, attacking their vital organs and inflicting upon them the severe injuries described hereinafter in greater detail."

4. "Section IV Hot Lab Work

"1. Preparation

"a. All authorized personnel must change to lab clothes before engaging in the hot lab work.

\* \* \* \* \*

"2. Hot Work

\* \* \* \* \*

"i. All work with unencapsulated sources shall be done by personnel having respirators in addition to lab clothing.

\* \* \* \* \*

"3. Cleanup

"a. No personnel previously employed in hot work shall be permitted to leave the hot lab until, (1) his pocket dosimeter has been read and the reading recorded. (2) his lab clothing has been monitored, removed and properly stored. (3) his body monitored for contamination and decontaminated if need be. (4) if work involved unencapsulated sources, a shower must be taken. See decontamination procedure following section VI."

In testifying about the March 13 incident on cross-examination, McVey said:

"A. As I stated before, I didn't realize I had it on my clothes. I never had this happen before, I had gone on home because the scanning equipment was in the lab and contaminated.

\* \* \* \* \*

"Q. Was your normal practice to scan yourself before going home? A. Well, it wasn't normal, no. I mean I didn't do it all the time. Sometimes I didn't do it. I didn't do it this time, this 13th.

\* \* \* \* \*

"Q. Why didn't you scan yourself on this occasion? A. I didn't have the instruments to do it.

"Q. But you could have picked the instrument up as you left the laboratory, couldn't you? A. Well, I could have, as I stated, but I say at that time maybe

288 F.2d—4½

it didn't occur to me. I wasn't really perturbed about it.

\* \* \* \* \*

"Q. So on the 13th if you wanted to scan yourself you could have gone back and put that instrument into operation and used it? A. Yes, I could have, yes."

Counsel for Phillips later cross-examined McVey on a pre-trial statement made by McVey.

"Q. 'The personal monitor is so contaminated that it has become inoperative. Therefore, I could not check my street clothes to find out if I had any contamination on them or not, and assuming that the locker gave enough protection, I assumed that the street clothes were not contaminated.'

"And yet there were instruments available with which you could have scanned, were there not? A. It was contaminated. It just said so.

"Q. Other instruments? A. There was no other instruments. I have explained that there was no other instruments in there that was operating. They were contaminated or they were inoperative. They were contaminated or they needed repairing.

"Q. When you went back on the 18th you picked one up and made it operate, didn't you? A. Yes, I suppose I did.

"Q. And you could have done that on the afternoon of the 13th? A. Well, it was time to go home.

"Q. Oh. And you didn't take time out to go and get it? A. I didn't think it was that important really."

Northway testified that at the time McVey was opening the shipment on March 13:

"A. To the best of my recollection, I was wearing my street clothes.

"Q. You had no protective clothing? A. I don't think so, no. I don't remember wearing—I never wore lab clothes.

\* \* \* \* \*

"A. I don't even know now. When you say 'protective clothing,' I did not wear lab clothes at any time. Never did I have on any lab clothes.

"Q. How about your respirator? A. No, I never wore a respirator in my life.

\* \* \* \* \*

"Q. Did you scan yourself on the day of the accident? A. No, I did not."

In addition to eliciting this testimony, the defense placed a Mr. Haycock, a

■ Plaintiffs, appellants' third point alleges error in the admission of two written exhibits. The first was the form used by M. W. Kellogg Company to order the irradiation by Phillips of the pellets involved in this case. The form was prescribed by the Atomic Energy Commission. Plaintiffs claim that the numerous disclaimer of liability provisions in the document misled the jury in determining what standard of care Phillips was required to meet. In part VI of their complaint, plaintiffs charge Phillips with breach of implied warranty. The order form in question was admissible to show the terms and conditions on which Phillips dealt with Kellogg and, more specifically, that no implied warranty could exist under the terms of the contract.[5] The other document was Kellogg's application to the Atomic Energy Commission to receive radioactive materials. On the back were printed essentially the same disclaimers of liability on the part of the Government that were present in the Kellogg-Phillips contract. The defendant says this document was admissible in answer to plaintiffs' allegation that Kellogg was not duly licensed to receive radioisotopes. This allegation was met, however, by the introduction of Kellogg's license. In the case of the application for the license as distinct from the order form, we think the prejudicial effect of the disclaimer provisions in misleading the jury as to Phillips' legal duty outweighed any probative value the document had in the case. Thus, we think its admission was error. But, in view of the more than 150 exhibits introduced in the case, and the fact that the trial lasted more than a month, resulting in nearly 2800 typewritten pages of testimony, we think that error was so diluted as to be harmless within the meaning of Rule 61, Federal Rules of Civil Procedure, 28 U.S.C.A.

Plaintiffs, appellants' final point is that the district court erred in entering judgment on a conflicting jury verdict. The alleged conflict is between the jury's answers to Interrogatories One (a) and Four (a) and Interrogatories Eight and Nine.

"*Interrogatory No. One:*

"(a) Do you find that Jackson E. McVey was injured by radiation at the M. W. Kellogg Company plant at South Houston, Texas, on March 13, 1957?

"You will answer 'Yes' or 'No.'

"Answer: No.

\* \* \* \* \* \*

"*Interrogatory No. Four:*

"(a) Do you find that H. E. Northway was injured by radiation at the M. W. Kellogg Company plant at South Houston, Texas, on March 13, 1957?

"You will answer 'Yes' or 'No.'

"Answer: No.

\* \* \* \* \* \*

"*Interrogatory No. Eight:*

"What sum of money, if paid now in cash, will fairly and reasonably compensate Jackson E. McVey for his pecuniary loss, physical pain and suffering and mental anguish which he has sustained and in reasonable

---

chemist for the AEC, on the stand. He told of a visit to the Kellogg South Houston facility in April of 1957, at which time Northway and McVey told him of the alleged March 13 incident. Northway admitted to him that he was not wearing the required protective clothing at the time of the alleged exposure. Mr. Haycock was also in doubt as to whether or not McVey took a shower following the March 13 incident.

5. "6. Neither the Government, the Commission, nor the operator of the AEC facility filling this order makes any express or implied warranty or other representation that (a) materials accepted for a service irradiation will not be destroyed, damaged, or otherwise altered in physical or chemical properties in the process of irradiation, or (b) materials furnished under this order (1) will not result in injury or damage when used for the purpose authorized by the Commission, (2) will accomplish the results for which they are requested and authorized by the Commission, (3) are safe for any other use, or (4) have particular physical or chemical properties or are of a particular quantity \* \* \*."

probability will sustain in the future as a direct and proximate result of the accident made the basis of this suit?

"You will answer in dollar and cents.

"Answer: $20,000.00

*"Interrogatory No. Nine:*

"What sum of money, if paid now in cash, will fairly and reasonably compensate H. E. Northway for his pecuniary loss, physical pain and suffering and mental anguish which he has sustained and in reasonable probability will sustain in the future as a direct and proximate result of the accident made the basis of this suit?

"You will answer in dollars and cents.

"Answer: $5,000.00."

A special verdict must, of course, be construed in the light of the surrounding circumstances, including the instructions of the court.[6] How this apparent inconsistency, so obvious to the legally trained mind, came about is not difficult to explain. After the jury had adjourned from the courtroom to commence its deliberations, its foreman sent a note to the district judge with the following question: "If 1(a) were answered 'no' would it be possible or in order to list some sum of money in No. 8." The district judge replied that "under the instructions that you should not consider the effects of your answers, I think 8 and 9 should be answered." Actually, the particular instruction, when considered in the light of the jury's question, permitted the jury to return answers which were apparently inconsistent with each other.

It is the duty of the court to reconcile or harmonize the answers with each other, if that can reasonably be done.[7] Interrogatories 1(a) and 4(a)

are plain and unambiguous. Judgment for the defendant could properly be entered on the answers to those interrogatories, for it is elementary that absent a showing of injury plaintiffs, appellants, had no claim entitling them to relief.[8] On the other hand, judgment for plaintiffs could not have been entered on the answers to Interrogatories Eight and Nine. For, although those interrogatories deal with compensation for injuries proximately resulting from the "accident made the basis of this suit," the element of negligence is nowhere mentioned.

Moreover, unlike Interrogatories 1(a) and 4(a), Interrogatories Eight and Nine were ambiguous and easily misunderstood. For example, "the accident made the basis of this suit," as used in those interrogatories, could have been taken by the jury to mean repeated daily exposure to radioactivity first let loose around March 13. So construed, the jury's view of plaintiffs' injuries need not be confined to those caused by radiation on March 13, 1957. We think that such must have been the understanding of the jury in view of the district court's permission for them "to list some sum of money in No. 8," even though "1(a) were answered 'no.'" In McVey's case, there is clear evidence that the jury had some such understanding, for it returned a "qualification and explanation" of its answer to Interrogatory No. 1(a) as follows:

"Qualifications and Explanations
"Interrogatory No. 1(a)

"The Jury feels that Jackson E. McVey did not receive enough radiation on March 13, 1957, to cause injury, but that subsequent exposures, due to the March 13th incident, plus an accumulation of prior exposures, were sufficient to cause some injury."

Under all of the circumstances, we agree with the district court that the intent of

6. Halprin v. Mora, 3 Cir., 1956, 231 F. 2d 197, 201.

7. Rorem v. Halliburton Oil Well Cementing Co., 5 Cir., 1957, 246 F.2d 427; Bass

v. Dehner, 10 Cir., 1939, 103 F.2d 28, 34; 89 C.J.S. Trial § 562, p. 324.

8. Prosser on Torts, 1955 ed., Sec. 1.

the jury is reasonably clear, and that the inconsistency in their answers is more apparent than real.

We find no reversible error in the record and the judgment is

Affirmed.