SCHUTZKY DISTRIBUTORS, INC., Plaintiff,

v.

Walter A. KELLY, Jr., et al., Defendants,

And Related Cases.

Nos. C–84–1226 WHO, C–84–1227 WHO and C–84–4401 WHO.

United States District Court, N.D. California.

Jan. 6, 1986.

---

William J. Hooy, Concord, Cal., for plaintiff.

Jeffrey R. Williams, Morgenstein, Ladd & Jubelirer, John P. Bosshardt, Raymond N. Erlach, Erlach & Erlach, Andrew J. Ogilvie, Collette & Erickson, San Francisco, Cal., John R. Couch, Jr., Stillwater, Okl., Richard S. Nemelka, Nemelka, Blakesley & Blakesley, Salt Lake City, Utah, Paul R. Burglin, San Rafael, Cal., for defendants.

## OPINION

ORRICK, District Judge.

These securities fraud actions were consolidated for all purposes, including for trial. After a three-week trial and two days of deliberations, the jury brought in special verdicts, more particularly hereindescribed.

Plaintiffs' counsel attacked the verdicts on the ground that they were inconsistent and ambiguous. The threshold issue facing the Court is whether to enter judgment on the verdicts as returned or whether to grant plaintiffs' motion for a new trial. If the Court enters judgment on the verdicts as returned, it must then determine whether to aggregate the jury's awards or whether to enter judgment only on the largest single award as to each plaintiff. Finally, the Court must determine whether plaintiff Durham's settlement with a former defendant should be deducted from his awards against defendants Rennert and Anderson. For the reasons enunciated below, the Court grants judgment on the verdicts as returned, aggregates the awards, and deducts Durham's settlement.

### I

This case involves the sale of oil and gas partnership interests issued by an Oklahoma corporation known as Earth Energy Resources, Inc. ("EER") to the assignor of plaintiff Schutzky Distributors, Inc. ("Schutzky") and to plaintiff David F. Durham. Schutzky's assignor was BCOM Investments, Inc. ("BCOM"), a wholly-owned subsidiary of Schutzky. BCOM actually purchased the subject securities. Schutzky Distributors, Inc., was owned entirely by Victor S. Schutzky and his wife, Marilyn H. Schutzky. The Schutzkys created BCOM at least in part to shelter Schutzky Distributors' income from federal and state taxes.

Plaintiffs Schutzky and Durham alleged that defendants Philip A. Rennert and Jay L. Anderson, among others, defrauded them by making material misrepresentations and omitting to disclose material facts in the course of selling the partnership interests. The partnerships were known as the 1981–C, 1981–D, and 1981–E EER Private Drilling Programs. Plaintiffs paid for the partnership interests one-third in cash and two-thirds by letters of credit. On and after July 20, 1981, BCOM paid $75,000 cash and $225,000 due pursuant to an irrevocable letter of credit through Wells Fargo Bank for interests in the 1981–C program.

At the same times, BCOM paid $112,500 cash and $337,500 pursuant to a letter of credit, again through Wells Fargo Bank, for interests in the 1981–D program. On and after November 24, 1981, BCOM paid $75,000 cash and $225,000 pursuant to a letter of credit for interests in the 1981–E program. On or about July 1, 1981, Durham paid $12,500 cash and $37,500 pursuant to a letter of credit through the Utica Bank for interests in the 1981–C program.

For the most part, EER's oil and gas exploration efforts failed. Plaintiffs' letters of credit were called, and the partnership interests became worthless. Schutzky had received $157,717.75 in income from its EER investments; Durham had received virtually no income from his investment.

Schutzky and Durham brought these actions. At trial, they sought to prove numerous misrepresentations of material facts relating to the offer and sale of the partnership interests, including the following:

1. that defendants were experienced, reliable, and knowledgeable in finding oil and gas, with a superior track record in similar ventures;

2. that plaintiffs' letters of credit would be retired in twelve months or less;

3. that defendants had substantial experience and connections in the oil and gas industry;

4. that defendants would keep accurate and complete books and accounts of operations, using the cash method of accounting;

5. that defendants would maintain separate books for the 1981–C, –D, and –E programs;

6. that defendants would have title examinations run on all prospects before wells were drilled;

7. that defendants would drill under certain developmental wells rather than running exploratory and "wildcat" tests; and

8. that defendants would perform an engineering and economic evaluation of potential reserves and possible net revenue for each test well, drilled in accordance with standard petroleum industry field practices, completing only such wells as prudent business judgment would allow.

The jury returned the following special verdicts:

**For Schutzky against Rennert:**

| | |
|---|---:|
| Rule 10b–5 | $ 67,000 |
| Section 12(2) | 126,000 |
| Section 12(2)—controlling person | 65,000 |
| California Corporations Code | 63,000 |
| California Corporations Code—extended liability | 35,000 |
| Total | $356,000 |

**For Schutzky against Anderson:**

| | |
|---|---:|
| California Corporations Code | $ 35,000 |
| Total | $ 35,000 |

**For Durham against Rennert:**

| | |
|---|---:|
| Rule 10b–5 | $ 5,000 |
| Section 12(2) | 6,500 |
| Section 12(2)—controlling person | 4,000 |
| California Corporations Code | 6,000 |
| California Corporations Code—extended liability | 3,500 |
| Negligent misrepresentation | 10,000 |
| Total | $ 35,000 |

**For Durham against Anderson:**

| | |
|---|---:|
| California Corporations Code | $ 5,000 |
| California Corporations Code—extended liability | 3,500 |
| Negligent misrepresentation | 5,000 |
| Total | $ 13,500 |

## II

### A

■ The Court deals first with the question of whether it should grant a new trial on the grounds that the verdicts are inconsistent and ambiguous. The Court's inquiry begins with the application of the Seventh Amendment. The Seventh Amendment dictates that courts must resist the temptation to resort to new trials unless it is virtually impossible to make sense of the verdicts as returned. To grant a new trial is to wrest the cause from the first jury. Once judges are given the discretion to discard jury verdicts as they see fit, the viability of the jury as an institution capable of rendering truly *binding* decisions is seriously imperiled. The Seventh Amendment forbids courts from converting jury verdicts into merely advisory

opinions. It is this danger of usurping jury prerogatives that has led courts consistently to hold that every attempt to harmonize or clarify a jury's verdicts must be made before a new trial can be granted. Writing for the Court in *Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines*, 369 U.S. 355, 364, 82 S.Ct. 780, 786, 7 L.Ed.2d 798 (1962), Mr. Justice Douglas stated:

Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way. For a search for one possible view of the case which will make the jury's finding inconsistent results in a collision with the Seventh Amendment.

Mr. Justice White, writing for the majority in *Gallick v. Baltimore & Ohio Railroad Co.*, 372 U.S. 108, 119, 83 S.Ct. 659, 666, 9 L.Ed.2d 618 (1963), quoted those same words from *Atlantic & Gulf Stevedores*, and added:

[I]t is the duty of the courts to attempt to harmonize the answers, if it is possible under a fair reading of them * * *. We therefore must attempt to reconcile the jury's findings, by exegesis if necessary, as in *Arnold v. Panhandle & S.F.R. Co.*, 353 U.S. 360 [77 S.Ct. 840, 1 L.Ed.2d 889]; *McVey v. Phillips Co.*, 288 F.2d 53 (C.A. 5th Cir.); *Morris v. Pennsylvania R. Co.*, 187 F.2d 837 (C.A. 2d Cir.) (collecting authorities), before we are free to disregard the jury's special verdict and remand the case for a new trial.

It should be noted that the *Gallick* Court went on to reverse the appellate court's reversal of the trial court's entry of judgment on the verdicts as they had been returned. *See also Guidry v. Kem Manufacturing Co.*, 598 F.2d 402 (5th Cir.1979) (court has duty, "arising from the [S]eventh [A]mendment guarantee of the right to jury trial, to reconcile apparently conflicting answers if at all possible and thus validate the jury verdict"); *Gonzales v. Missouri Pacific Railroad Co.*, 511 F.2d 629, 633 (5th Cir.1975) (the "Seventh Amendment mandates this Court to search for a view of the case that makes the jury's answers consistent"). It cannot be stressed enough that the earnest search for

clarity and consistency in a jury's special verdicts is not merely a matter of economy and expeditiousness, although certainly those virtues are also thereby achieved. Rather, the foregoing authorities make it clear that the Constitution commands no jury be deprived of its province to decide the cause put before it unless there is no feasible alternative.

### B

Nor could the Court simply recall the jury and inquire as to its intentions, as plaintiffs have previously urged. The grave dangers inherent in querying a jury about apparently inconsistent or ambiguous special verdicts have been expounded upon elsewhere. In *McCollum v. Stahl*, 579 F.2d 869 (4th Cir.1978), the jury had returned special verdicts finding no liability as to a particular defendant, yet awarding damages against him. The trial court resubmitted the verdicts, whereupon the jury again awarded damages against the defendant, but this time also found liability. The Fourth Circuit vacated in part and reversed and remanded in part. It found that the resubmission of verdicts had the "inescapable implication" that there was nothing wrong with the jury's award, but that it required legal justification. The remand of questions to the jury was "tantamount, in its effect, to a direction to the jury to find liability in order to warrant the award of damages." *Id.* at 871.

Writing for the Fifth Circuit in *Perricone v. Kansas City Southern Railway Co.*, 704 F.2d 1376, 1378–79 (1983), Judge Higginbotham graphically described the reasons why trial courts must be reluctant to interview or otherwise submit supplemental instructions to a jury:

The trial judge is a potent figure indeed. His instructions are lethal. He can communicate his attitude in a thousand ways from a cocked eyebrow to a sideways glance. Those will not be of record. They are not reviewable. Trial judges are disciplined ultimately only by their good faith and integrity and by an occasional reminder from their appellate

brethren to be constantly vigilant of their power.

And just recently, in *E.F. Hutton & Co. v. Arnebergh*, 775 F.2d 1061 (9th Cir.1985), the practice of reconvening and interviewing a jury was disapproved. The *Arnebergh* court pointed out that Federal Rule of Evidence 606(b) "forbids the receipt of juror testimony concerning matters occurring during the course of deliberations or concerning the jury's reasoning process in reaching a verdict." The only exceptions to that prohibition arise when the verdict may have been affected by "extraneous prejudicial information" or "any outside influence." *Id.* 775 F.2d at 1064. Neither circumstance is present in this case. The language of *Arnebergh*, viewed alongside *Perricone* and *McCollum, supra,* militates against the interrogation of the jury as to its intentions.[1]

## C

■ Mindful of the Seventh Amendment's clear command to clarify and harmonize the jury's answers, if such can be done, the Court now turns to the task of reconciling the answers to the questions put in the form of special verdicts. The nub of plaintiffs' argument against the jury's verdicts is that the awards as to the various causes of action are inconsistent. Plaintiff Durham, in particular, notes that he was involved in only one "buy/sell transaction"; and, therefore, he argues that the jury could not possibly find that he sustained different amounts of damages as to his various causes of action. The answer to Durham's contention is twofold.

First, though there may have been but one "buy/sell transaction" in Durham's case (there were at least three transactions in Schutzky's case), plaintiffs alleged countless misrepresentations that could have given rise (in the jurors' minds) to liability. Some of plaintiffs' more notable allegations of affirmative misrepresentations are enumerated above. That list does not even include the numerous allegations of material omissions. The jury was within its right to decide that plaintiffs had proved some or all of their allegations.

But if plaintiffs are pleased that the jury concurred in their theory of multiple misrepresentations (plaintiffs called it their "layering" theory), then they must also accept what comes with it—the entirely logical possibility that the jury found each misrepresentation to be a *partial* inducement for the subject investments in this lawsuit. In other words, each misrepresentation could have played a small part in the overall inducement of each plaintiff to place money in the EER programs, and each of the misrepresentations could have gone toward establishing a different cause of action. Further complicating matters, more than one misrepresentation could have gone toward establishing certain causes of action; e.g., only one misrepresentation might have satisfied the requisite elements of Rule 10b–5, yet four or five misrepresentations may have satisfied the requirements of § 12(2).

Second, and more importantly, the jury could have reasonably found that each misrepresentation was the *proximate cause* of a different amount of damages. Even in the case of Durham, where there was only one transaction, the jury could have found that the acts or omissions giving rise to liability under one statutory provision were

1. In holding that the trial judge correctly refused to enter judgment on the verdicts as returned, the *Arnebergh* court did not reach the Seventh Amendment question. Query whether consideration of the Supreme Court cases interpreting the Seventh Amendment (*Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines,* 369 U.S. 355, 82 S.Ct. 780, 7 L.Ed.2d 798 (1962) and *Gallick v. Baltimore & Ohio Railroad Co.,* 372 U.S. 108, 83 S.Ct. 659, 9 L.Ed.2d 618 (1963)) would have affected that holding. In any event, *Arnebergh* does not mandate a new trial here.

It holds only that the particular verdicts before that court were so ambiguous that judgment could not properly be entered upon them: "*In these circumstances,* the district court correctly declined to enter judgment on the basis of an ambiguous verdict." *E.F. Hutton & Co. v. Arnebergh,* 775 F.2d 1061, 1063 (9th Cir.1985) (emphasis added). *Arnebergh* made no attempt to delineate general standards for the determination of whether verdicts are "inconsistent" or "ambiguous".

the proximate cause of more or less damage than the acts or omissions giving rise to liability under another provision. For example, the jury could have found that Durham relied completely on one misrepresentation, and would not have purchased any interests at all but for that misrepresentation; while at the same time the jury could have found that Durham only relied somewhat on a second misrepresentation, and that he probably would have purchased *some* partnership interests even if the misrepresentation had never occurred. In this event, some of the loss would be recoverable under the law of proximate cause, and some of the loss would not be recoverable.

In his memorandum, Durham himself points out that the proximate cause instruction (No. 15) applied to all alternative theories of liability. The instruction read, in pertinent part:

> [P]laintiffs must show that the misleading statement or omission played a substantial part in bringing about or causing the damage suffered by them and that the damage was either a direct result or a reasonably foreseeable result of the misleading statement.

The jury could easily have found that certain misrepresentations played a more "substantial" part in bringing about damages than did other representations. This delicate balancing function must be deemed within the jury's prerogative and competence. The jury carefully walked through all the steps necessary to ascertain what loss was compensable and what loss was not. The jury was both meticulous and diligent. The "layered fraud" theory was complex and richly detailed. Some compromise among jurors, entirely permissible, may have gone into the breakdown of damages. Viewed in light of these factors, the verdicts are neither inconsistent, ambiguous, nor surprising. They must be upheld.

### III

█ The next question is whether to enter aggregated awards. This clearly is a proper issue for the Court to decide. Under Federal Rule of Civil Procedure 49(a),

the court has the duty to resolve "every element of recovery * * * lest the verdict remain incomplete and indecisive." *Guidry*, 598 F.2d at 406. Judge Rubin's scholarly treatment of special verdicts and their attendant problems states explicitly that "[if] counsel do not timely request that an issue be submitted to the jury, it may be resolved by the court." *Id.* In this case, both sides neglected to make a timely demand for the submission of the aggregation issue to the jury. The Court, under the authority of *Guidry*, has the power to resolve the issue on its own initiative.

█ The Court must strive to construe the awards such that they are "logical and probable." *Griffin v. Matherne*, 471 F.2d 911 (5th Cir.1973). It cannot fairly be said that the jury meant to find liability in this case, and yet award what would amount to nominal damages in light of the amounts invested. Defendants would have the Court interpret the jury's wish to be an award of merely $10,000 on Durham's nearly $50,000 investment. Defendants have never satisfactorily explained the remarkable closeness of the aggregated award to Durham ($48,500) to his out-of-pocket losses ($49,930.98). It is patently obvious that the jury meant to award Durham $48,500, and believed it was being asked to assign portions thereof to each cause of action, as the jury interpreted the evidence. Because the verdicts are "logical and probable" only if they are aggregated, the Court must enter judgment on the aggregated awards. The judgments will not be "joint and several," as defendants insist. The jury obviously meant to award Durham a total of $48,500 and Schutzky a total of $391,000. Making the judgments joint and several as between Rennert and Anderson obviously would reduce the awards to the size of the verdicts against Rennert alone.

### IV

█ The $17,500 settlement between Durham and former defendant Gary Stewart, however, must be deducted from Durham's awards against Rennert and Ander-

son. The jury could not permissibly have found Stewart primarily liable; at most, it could have found Stewart secondarily liable for damages already assessed against Rennert and Anderson. Thus, Stewart would have been jointly and severally liable with Rennert and Anderson. *Cf. MacKethan v. Burrus, Cootes & Burrus*, 545 F.2d 1388 (4th Cir.1976). As noted above, the jury obviously found damages in the amount of Durham's out-of-pocket loss. A failure to deduct the settlement with Stewart would result in a windfall to Durham. The settlement will be deducted evenly from the awards against Rennert and Anderson.

## V

Accordingly, IT IS HEREBY ORDERED that the Clerk of this Court shall:

1. Record the special verdicts pertaining to plaintiff Schutzky Distributors, Inc.

2. Record the special verdicts pertaining to plaintiff David F. Durham.

3. Enter the judgments annexed hereto, in accordance with the special verdicts and with Federal Rule of Civil Procedure 79(a), each party to bear its own costs.