**CITY OF RICHMOND, VIRGINIA,**
Plaintiff–Appellee,

v.

**MADISON MANAGEMENT GROUP, INC.; GHA Lock Joint, Inc., Defendants–Appellants (Two Cases).**

**CLEVEPAK CORPORATION; Marbro Company, Inc., Defendants & Third Party Plaintiffs,**

v.

**WHITMAN, REQUARDT AND ASSOCIATES, Third Party Defendant (Two Cases).**

**CITY OF RICHMOND, VIRGINIA,**
Plaintiff–Appellant,

v.

**MADISON MANAGEMENT GROUP, INC.; GHA Lock Joint, Inc.; Marbro Company, Inc., Defendants–Appellees.**

**CLEVEPAK CORPORATION, Defendant & Third Party Plaintiff,**

v.

**WHITMAN, REQUARDT AND ASSOCIATES, Third Party Defendant.**

**CITY OF RICHMOND, VIRGINIA,**
Plaintiff–Appellee,

v.

**MARBRO COMPANY, INC., Defendant & Third Party Plaintiff–Appellant,**

and

**Madison Management Group, Inc.; GHA Lock Joint, Inc., Defendants.**

---

**CLEVEPAK CORPORATION,**
Defendant & Third Party
Plaintiff,

v.

**WHITMAN, REQUARDT AND
ASSOCIATES,** Third Party
Defendant.

Nos. 89–2748, 89–2776, 89–2798
and 89–2801.

United States Court of Appeals,
Fourth Circuit.

Argued June 6, 1990.

Decided Oct. 30, 1990.

As Amended Nov. 6, 1990.

Robert Franklin Brooks, Sr., Hunton & Williams, Richmond, Va., Stephen Joseph Annino, Kasimer & Ittig, P.C., Falls Church, Va., argued (Joseph H. Kasimer, Kasimer & Ittig, P.C., Falls Church, Va., G.H. Gromel, Jr., Matthew J. Calvert, Hutton & Williams, Richmond, Va., Kent E. Mast, Alan M. Wolper, Peter H. Strott, Scott R. Phillips, Hunton & Williams, Atlanta, Ga., on the brief), for defendants-appellants.

David Henry Worrell, Jr., McGuire, Woods, Battle & Boothe, Richmond, Va., argued (E. Duncan Getchell, Jr., William G. Broaddus, Jr., J. William Boland, Charles Wm. McIntyre, Jr., McGuire, Woods, Battle & Boothe, Richmond, Va., G. Timothy Oksman, City Atty., Michael K. Jackson, David B. Kearney, Asst. City Atty., Richmond, Va., on the brief), for plaintiff-appellee.

Before HALL and MURNAGHAN, Circuit Judges, and TILLEY, United States District Judge for the Middle District of North Carolina, sitting by designation.

MURNAGHAN, Circuit Judge:

Interpace Corporation ("Interpace") was a manufacturer of concrete pipe. Interpace sold some of its pipe to Marbro Company, Incorporated ("Marbro"), for use in a contract between Marbro and the City of Richmond ("the City"), under which Marbro was to construct a water transmission main. Some of that pipe has proved to be defective. The case before us concerns the City's attempts to impose liability for the defective pipe upon Marbro and two entities, GHA Lock Joint, Incorporated ("GHA"), and Madison Management Group ("Madison"), which are alleged to be Interpace's successors in interest. For the reasons set forth in the lengthy opinion that follows, we affirm the jury's finding that Madison and GHA are liable for fraud and that Marbro is not liable for breach of contract. We also affirm the award of punitive damages against Madison and GHA. However, we remand the case for a new trial as to damages on the fraud count. Marbro shall not be required to defend in the additional proceedings.

## I

### A

At the center of the controversy is a water transmission line that runs through Henrico County, Virginia, and services the City of Richmond. A vital component of the line, obviously, is concrete pipe, an essential element of which is wire. The function of wire is to provide the pipe with structural strength.

Wire is classified in two ways: by class number, which measures strength, and by gauge number, which measures width. Wire strength has two aspects. Longitudinal or tensile strength measures the wire's resistance to breaking if pulled at its ends; ductile strength measures a wire's ability to bend without breaking. Wire that possesses low ductility is said to be "brittle."

Wire is made by drawing a metal rod through dies. Evidence presented at trial indicated that the speed with which wire is drawn can affect both the ductile and tensile strength of the wire. Evidence also showed that a wire producer could create a wire of sufficiently high tensile strength while using less steel if the wire is drawn more quickly.

Interpace produced pipe that was made with Class IV wire. Some of the wire was 6-gauge and some was 8-gauge. During the 1970s, Interpace sold its Class IV wire to various purchasers, some of whom experienced difficulties in the form of pipe ruptures. Evidence presented at trial suggested that the pipe ruptures resulted from the wire's alleged inadequate ductility, which made the wire brittle and created longitudinal splits. Evidence also indicated that Interpace was aware that some of its pipe was defective and that the drawing process

in producing the Class IV wire may have been the cause of the defects.

## B

On February 2, 1979, the City issued an invitation to bid on the contract for construction of the water transmission line. Interpace apparently began to review the bid invitation documents shortly thereafter. On March 9, 1979, Interpace supplied to Marbro, at that time a potential recipient of the general contract, a proposal to manufacture and supply the pipe for the project. On March 15, 1979, Marbro submitted its bid on the project. The firm of Whitman, Requart & Associates ("WRA"), the City's engineers, recommended to the City that the contract be awarded to Marbro, whereupon Marbro and Interpace orally agreed that Interpace would supply the pipe provided that Marbro was ultimately awarded the contract. In the course of the City's determination regarding award of the contract, the City reviewed Interpace's specifications to ensure that Interpace could supply pipe that would conform to the project's needs. On April 30, 1979, Marbro and Interpace formed a contract under which Interpace agreed to supply conforming pipe. On May 8, 1979, the City awarded Marbro the general contract. On May 16, 1979, Interpace "certif[ied]" to Marbro that it would supply pipe that "will be manufactured in accordance with the Contract Specifications." App. at 1480. Marbro ultimately commenced constructing the pipeline.

## C

On July 2, 1981, GHA acquired Interpace's pipe manufacturing assets. Interpace remained in business although it no longer manufactured pipe. In September 1982, mortar spalling was discovered on a portion of the transmission line. Spalling is the separation of sections or pieces of the exterior mortar coating that protects the wire used in making the pipe. For reasons that are discussed in more detail *infra*, GHA assisted in the repair of the spalling. That spalling was not the problem that ultimately gave rise to the lawsuit.

On August 14, 1987, after completion of the project,[1] one segment of the pipe supplied by Interpace burst. On October 14, 1988, another segment of the pipe burst. There have been no subsequent failures of any of the pipe in the transmission line. It is these two pipe failures that prompted the City to bring the instant lawsuit.

## D

The procedural history of the City's suit is somewhat complex and includes details that need not concern us. For our purposes, it is enough to note the following. The City sought recovery from Madison, GHA, and Marbro. Through a variety of corporate maneuvers, Madison had become an acknowledged successor in interest of Interpace, and the City sought to hold Madison liable for Interpace's actions on a successor in interest liability theory. The City also sought successor in interest recovery against GHA. Pretrial motions disposed of various claims and the City ultimately went to trial asserting fraud and breach of contract by Interpace, for which Madison and GHA were alleged to be liable, and breach of contract against Marbro. As damages, the City sought the cost of replacing the pipeline. The case was tried before a jury.

The jury found that Interpace had committed fraud. It further found that Madison and GHA were liable for Interpace's fraud. The jury also found that Interpace had breached its contract and it found that Madison and GHA were liable for that breach. Finally, the jury found that Marbro was not liable for breach of contract.[2]

As to damages, the jury found that, despite the presence of liability, the City was entitled to nothing on its breach of contract

---

1. The parties are not in agreement as to the proper designation of the project completion date.

2. The jury also found in Marbro's favor on a counterclaim it had brought against the City. That result has not been appealed and does not bear on any of the issues presented.

claim against Madison and GHA. On the fraud claims, the jury indicated on both the verdict form for the suit against Madison and the verdict form for the suit against GHA that it had awarded $5,000,000 in compensatory damages and $500,000 in punitive damages. Upon motion by both parties for clarification of the jury award, the district court ruled that the jury intended to award $10,000,000 in compensatory damages jointly and severally, and $500,000 severally against Madison and GHA.

The jury result has produced the appeal that we must now resolve. Madison and GHA, to which we shall refer collectively as "the Pipe Defendants," have alleged eleven errors below, several of which apply only to GHA. Marbro has made a conditional appeal. Marbro, obviously, hopes that we do not disturb the result reached below. However, if we grant the Pipe Defendants a new trial, Marbro asserts, we should not grant the City a new trial as against Marbro. For its part, the City also has made a conditional appeal. Should we grant a new trial, the City claims, we should include Marbro as a defendant and we should allow the City to proceed against the Pipe Defendants on a constructive fraud theory. We now begin our descent into the fourteen rings of *City of Richmond v. Madison, GHA and Marbro.*

## II

The Pipe Defendants argue that, for several reasons, the district court should not have allowed the City's fraud claim to reach the jury. First, they contend that the claim is time-barred. Second, they point out that the City sought to recover the cost of replacing the pipe system and that such damages constitute economic loss. They argue that Virginia law, which governs the controversy, does not allow for the recovery of economic loss damages in tort actions such as the City's. Third, they argue that to the extent Virginia law would allow recovery of such damages in tort under a fraud theory, it would allow such recovery only for fraud in the inducement, not for intrinsic fraud. The City, the Pipe

Defendants argue, did not present clear and convincing evidence that would allow the jury to find fraud in the inducement.

### A

■ We turn first to the Pipe Defendants' contention that the City's fraud claim was time barred. They rely upon the Virginia Statute of Repose ("Statute"), Va. Code Ann. § 8.01–250, which provides:

No action to recover for any injury to property, real or personal, ... arising out of the defective and unsafe condition of an improvement to real property, ... shall be brought against any person performing or furnishing the design, planning, surveying, supervision of construction, . or construction of such improvement to real property more than five years after the performance of furnishing of such services and construction.

The limitation prescribed in this section shall not apply to the manufacturer or supplier of any equipment or machinery....

The Pipe Defendants argue that the Statute bars the City's fraud claim. They argue that the fraud claim was for "injury to property," arising out of an "improvement to property." Further, they contend, June 2, 1982, is the relevant date for computing the Statute's five year period.[3] The City brought its claim in September 1987, more than five years later. Therefore, the Pipe Defendants conclude, under the Statute, the City's claim is barred because it was brought more than five years after Marbro completed installation of the pipeline.

However, in order for the Statute to bar the City's claim, the Pipe Defendants must also overcome the Statute's provision that "the limitation ... shall not apply to the manufacturer or supplier of any equipment or machinery." In *Cape Henry Towers, Inc. v. National Gypsum Co.,* 229 Va. 596, 602, 331 S.E.2d 476, 480 (1985), the Supreme Court of Virginia held:

We conclude that the General Assembly intended to perpetuate a distinction between, on one hand, those who furnish

---

**3.** June 2, 1982, is the date on which Marbro completed the construction "punch list."

ordinary building materials, which are incorporated into construction work outside the control of their manufacturers or suppliers, at the direction of architects, designers, and contractors, and, on the other hand, those who furnish machinery or equipment. Unlike ordinary building materials, machinery and equipment are subject to close quality control at the factory and may be made subject to independent manufacturer's warranties, voidable if the equipment is not installed and used in strict compliance with the manufacturer's instructions. Materialmen in the latter category have means of protecting themselves which are not available to the former. We construe § 8.01–250 to cover the former category and not the latter.

The question of whether the Pipe Defendants are entitled to the Statute of Repose, therefore, turns on whether the pipes were "ordinary building materials." If the pipes were not ordinary building materials, the Statute does not bar the City's fraud claim.

*Cape Henry Towers*'s concern for whether the materials at issue were "subject to close quality control at the factory" suggests that relatively sophisticated discrete materials such as the pipes here at issue are more like equipment and less like ordinary building materials. *Cape Henry Towers* considered "ordinary building materials" to be those "which are incorporated into construction work outside the control of their manufacturers or suppliers." Interpace exercised control over the structural integrity of the pipes, and, therefore, the pipes' incorporation into the overall project should not be considered "outside the control" of Interpace. Although Marbro, not Interpace, installed the pipes, Russ Marrinucci, Marbro's president, testified that "Interpace had assisted the engineer and the City in designing this job," and that Interpace, WRA, and Marbro collaborated in developing the "shop drawings and lay schedules." Accordingly, we conclude that the Statute of Repose does not bar the City's fraud claim.[4]

**B**

The Pipe Defendants argue that the district court should not have allowed the City to recover the costs of repairing the pipe under a fraud theory. They contend that such recovery constitutes recovery for economic loss and Virginia law does not permit the recovery of economic loss in tort actions.

■ The Pipe Defendants rely on *Sensenbrenner v. Rust, Orling & Neale, Architects, Inc.*, 236 Va. 419, 374 S.E.2d 55 (1988). In that case, a swimming pool that was installed in the plaintiffs' newly constructed home proved to be defective, causing damage to the home and the pool itself. The plaintiffs brought a negligence action to recover damages from the architect and the pool installer with whom the builder had subcontracted. After discussing at length the availability *vel non* of damages for economic loss, the Supreme Court of Virginia concluded that the plaintiffs were not entitled to recovery. 236 Va. at 425, 374 S.E.2d at 58. Not surprisingly, the parties offer two different interpretations of *Sensenbrenner.*

The City relies heavily upon the fact that *Sensenbrenner* involved ordinary negligence, not fraud. Moreover, *Sensenbrenner* appeared to draw guidance from *East River Steamship Corp. v. Transamerica Delaval Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), in which the United States Supreme Court held that a plaintiff in admiralty cannot recover for pure economic loss under a products liability theory. 476 U.S. at 866–76, 106 S.Ct. at 2299–2304; *see Sensenbrenner*, 236 Va. at 424, 374 S.E.2d at 57. Like *Sensenbrenner*, *East River* did not involve fraud, and the Court explicitly limited its holding to ordinary negligence actions. *See* 476 U.S. at 871 n. 6, 106 S.Ct. at 2302 n. 6 ("We do not reach the issue whether a tort cause of action can ever be stated in admiralty when the only damages sought are economic.").

---

**4.** Our affirmance on the basis of the "equipment or machinery" exception in the Statute makes it

unnecessary to examine the multiple other bases for affirmance that the City suggests.

The Pipe Defendants counter that *Sensenbrenner* employed sweeping language and showed no indication that the Supreme Court of Virginia would allow recovery for economic loss in fraud actions. For example, the *Sensenbrenner* court wrote:

> The effect of the failure of the substandard parts to meet the bargained for level of quality was to cause a diminution in the value of the whole, measured by the cost of repair. *This is a purely economic loss, for which the law of contracts provides the sole remedy.*
>
> Recovery in tort is available only when there is a breach of a duty to "take care for the *safety* of the person or property of another."

236 Va. at 425, 374 S.E.2d at 58 (emphasis added) (citing *Blake Construction Co. v. Alley*, 233 Va. 31, 34, 353 S.E.2d 724, 726 (1987) (emphasis added by *Sensenbrenner* court)).

To interpret *Sensenbrenner,* we turn to the purpose of application of the bar on recovery of economic losses (to which we will refer as the "economic loss rule" or "rule") in the context of parties with contractual duties. In such a context, the economic loss rule is intended to preserve the bedrock principle that contract damages be limited to those "within the contemplation and control of the parties in framing their agreement." *Kamlar Corp. v. Haley,* 224 Va. 699, 706, 299 S.E.2d 514, 517 (1983). The Supreme Court of Virginia has noted that the absence of such a limitation on damages in tort actions has "led to the 'more or less inevitable efforts of lawyers to turn every breach of contract into a tort.'" *Id.* (citing W. Prosser, *Handbook of the Law of Torts* § 92, at 614 (4th ed. 1971)); *see also East River,* 476 U.S. at 866, 106 S.Ct. at 2299 (if products liability were to expand too greatly, "contract law would drown in a sea of tort"). The economic loss rule restrains such efforts by preventing a plaintiff from pasting an ill-suited tort label on a set of facts that supports nothing more than a breach of contract claim. The rule undermines such a strategy because it prevents a plaintiff, whose only legitimate ground of complaint is that a contract has been breached, from

collecting in a tort action both economic loss damages and damages generally cognizable in tort. The rule's purpose therefore is not implicated where close inspection of the plaintiff's case reveals a genuine foundation for a tort claim. In such situations, there is no risk that a plaintiff will be pursuing a tort remedy when in fact he should be confined to a contract remedy. Thus, if, when the surface is scratched, it appears that the defendant has breached a duty imposed by law, not by contract, the economic loss rule should not apply.

There is abundant support within *Sensenbrenner* for our interpretation of the economic loss rule. After noting the undesirability of allowing tort law to consume contract law, *see* 236 Va. at 424, 374 S.E.2d at 57, *Sensenbrenner* focused on the differing origins of tort duties and contract duties:

> The law of torts is well equipped to offer redress for losses suffered by reason of a "breach of some duty imposed by law to protect the broad interests of social policy." Tort law is not designed, however, to compensate parties for losses suffered as a result of a breach of duties assumed only by agreement. That type of compensation necessitates an analysis of the damages which were within the contemplation of the parties when framing their agreement. It remains the particular province of the law of contracts.

236 Va. at 425, 374 S.E.2d at 58. As a sextant for determining whether "the damages claimed in a particular case may more readily be classified" as having their origin in tort or contract, the court pointed out that "[t]he controlling policy consideration underlying the law of contracts is the protection of expectations bargained for." *Id.* Having advised such close inspection of the complaint, the *Sensenbrenner* court noted that the complaint before it "alleges no facts showing a breach of any [duty owed by the defendants to the plaintiffs] imposed by law." *Id.*

Applying *Sensenbrenner*'s mandate, we now examine the facts alleged by the City. Virginia law recognizes the sepa-

rate tort of fraud, even where the parties have agreed to a contract. In *Lissmann v. Hartford Fire Ins. Co.*, 848 F.2d 50 (4th Cir.1988), we cited *Colonial Ford Truck Sales, Inc. v. Schneider*, 228 Va. 671, 325 S.E.2d 91 (1985), and concluded that Virginia law "distinguishes between a statement that is false when made and a promise that becomes false only when the promisor later fails to keep his word. The former is fraud, the latter is breach of contract." *Lissmann*, 848 F.2d at 53; *cf. Kamlar*, 224 Va. at 707, 299 S.E.2d at 518 (allowing punitive damages in contract context where there is "proof of an independent, wilful tort, beyond the mere breach of a duty imposed by contract"). Here, the City does not allege mere failure to keep a promise. Instead, it alleges that Interpace knew, at the time it promised to supply conforming pipe, that it would not supply conforming pipe. Thus, contrary to the Pipe Defendants' assertion, it is not the case that "[t]he City's allegations of fraud constitute nothing more than a thinly-veiled recasting of its claim for breach of contract as a tort." *See* Reply Brief of Appellants at 18–19. "The case at bar does not involve any such attempt to dress up a contract claim in a fraud suit of clothes." *Triangle Underwriters, Inc. v. Honeywell, Inc.*, 604 F.2d 737, 747 (2d Cir.1979) (examining allegation to determine whether to apply the statute of limitations for fraud or contract).

The City has alleged that Interpace violated a duty imposed by tort law, *i.e.*, the duty not to commit fraud. Accordingly, the Pipe Defendants are not entitled to the protection of the economic loss rule, which protects only those defendants who have breached only contractual duties.

## C

■ The Pipe Defendants argue that, even if, as we now have held, economic loss damages are available in a fraud action, the City's fraud claim should not have reached the jury because the City did not present sufficient evidence to support a finding of fraud. "The elements of actual fraud, to be proved by clear and convincing evidence, are: a false representation of a material fact, made intentionally and knowingly, with intent to mislead, reliance by the party misled, and resulting damage to the misled party." *Elliott v. Shore Stop, Inc.*, 238 Va. 237, 244, 384 S.E.2d 752, 756 (1989). The Pipe Defendants argue that the City did not present sufficient evidence of either Interpace's knowledge that the pipes were inadequate or of the City's reliance upon Interpace's alleged misrepresentations. Thus, the Pipe Defendants conclude, the City showed that, at most, Interpace breached its contractual duty to supply pipes in conformity with the promised standard; such breach of contract, they argue, does not constitute fraud. *See Lissmann*, 848 F.2d at 53 (under Virginia law, fraud requires that "statement must have been false *when made*") (emphasis in original).

At trial, the City presented several forms of evidence in its attempt to prove that Interpace knowingly misrepresented its ability to supply conforming pipe. First, the City showed that Class IV pipe supplied by Interpace had failed in numerous locations around the country during the 1970s and that Interpace was aware of the failures.[5] Second, the City elicited from several witnesses the following testimony suggesting that Interpace was aware that, contrary to Interpace's assurances, the Class IV wire could not meet the standard required by the contract:

— Expert metallurgist Kenneth Earl Niewoehner testified that, while he served on the American Society of Testing and Materials ("ASTM"), Interpace twice approached ASTM requesting that it sanction or "incorporate" Interpace's Class IV wire into ASTM specifications. Niewoehner testified that not only did the ASTM decline to do so, but it informed Interpace, on both occasions, that its refusal to do so was based on the concern

---

**5.** The failures occurred in Center, North Dakota; Pinellas County, Florida; the Washington Suburban Sanitation Commission; Fairfax County, Virginia; Cobb County, Georgia; and Gwinnett County, Georgia.

that the wire was "erratic" and uncertainty as to the wire's "ductility."

—— Donald E. Dodd, Interpace's chief engineer from 1968–1981, testified that Interpace experienced "brittle breaks" with wire that was "splintered" or "has cracks in it." He testified that Interpace used the Class IV wire "[f]or economic reasons; in other words, it uses—you use 13 percent less wire for each increase in wire class. It is a money saver and gives the company a good competitive advantage in bidding." Dodd further testified that he "had begun to develop serious doubts [about Interpace's use of Class IV wire] after the failure with—at Center, North Dakota in 1976." Dodd also said that by "1979, 1980[, e]arly 1980," "there became a time when there were so many complaints from our customers and there [were] so many failures in the plant on the wrapping machine, that something had to be done with the Class IV wire."

—— Robert E. Bald, who held a high ranking engineer's position with Interpace during the 1970s, testified that there were discussions within Interpace regarding possible discontinuance of use of the Class IV wire. Bald testified that much of the concern was motivated by failures of the Class IV wire.

The City also introduced or read into the record a variety of internal Interpace documents, all of which were dated prior to the Spring of 1979, when Interpace assured that it could supply conforming pipe. Portions of those documents included the following remarks:

—— "Seams and splits in number 8 gauge Class IV wire on pipe for Center have raised questions regarding minimum wire size, maximum strength, drawing practices and rod quality."

—— "Class IV prestressed wire, in columns location problem source and solution. Location Solon, problem brittleness, seem [sic] splits, source, drawing practice; solution, rod coating, lower drawing speed, modified drawing practice, switch to Class III."

—— "In regard to problems encountered with high tensile wire splitting when being cut and with wire breakage in some coils, Matthews stated that the available evidence indicates the problem is not with the rod, but may be with the drawing practice."

The City also presented additional evidence of internal Interpace correspondence during the period of contract performance which also suggested that Interpace believed that its product was defective. That correspondence included the following remarks:

—— "Red flag items. Fairfax county is a potential bomb."

—— "[I]t is apparent that we do not have in place adequate quality control procedures, systems or personnel to assure the division that product is being manufactured in accordance with engineer specifications. It is also apparent that the inadequacy is large."

—— "Customers in Cobb County Georgia; Gwinnett County, Georgia; Fairfax, Virginia; and Pinellas County, Florida have a conference hot line which has been kept busy by Lock Joint product failures. They have concluded that the mortar coating fails (too porous, for bond to wire, et cetera) and then the wire fails (from attack or because it, too, is faulty—laminated, et cetera). The situation is serious; we feel that our responsive, concern[ed] attitude and willingness to work with the customers on each problem which comes up is most effective response. This is a 'no-win' issue."

—— "We continue to have breaks in the Gwinnett system. Unfortunately, the break in this Atlanta suburb took place during the American Water Works Association convention and was a subject of television coverage which opened a broad universe of water works personnel (consultants and owners) to the problem."

— "Quality problems. Numerous pipe failures, primarily throughout the southeast are cause for concern."

— "Major activities for the week ending June 7, 1980. Class IV wire problem—much time devoted to this."

Finally, John M. Kiefer, Jr., a metallurgist hired by Interpace, and later GHA, as a consultant testified that in 1978 and 1979, he observed Interpace's production of Class IV wire. He testified that he observed that Interpace was drawing the wire too fast. He further testified that, in "probably about 1980," he informed Interpace of his conclusion and of the likely effect of lowering the ductility of the wire.

Facing that mountain of evidence suggestive of Interpace's knowledge of the inadequacy of its Class IV wire, the Pipe Defendants respond with a characterization of the evidence that has some persuasive force. They emphasize that, despite all of the reported failures, *none* of the Class IV 6-gauge wire it produced had ever failed and less than .01 percent of the Class IV 8-gauge wire it produced had ever failed. They observe that "no large business can make 100% of its product without some problems." Moreover, they point out that Interpace never conclusively determined that the failures that did occur were due to the nature of the prestressing wire. Finally, they call attention to the fact that the City failed to exact an admission from any Interpace employee that Interpace knew its pipe was nonconforming when the contract was formed or when the pipe was delivered.

We believe that, nevertheless, there was sufficient evidence to support the jury's finding of knowing misrepresentation. Although the percentage of segments that failed was small, a reasonable juror could conclude that the Pipe Defendants' "Hey, nobody's perfect" approach at trial was belied by the voluminous evidence indicating that Interpace considered the failures of its Class IV wire to be a serious problem.[6] A reasonable juror could have discredited the Pipe Defendants' attempts to explain away the urgent tone of the internal Interpace correspondence as showing, the Pipe Defendants contend, nothing more than "Interpace's concern for its customers and a readiness to stand behind its products." If Interpace's failure rate was no big deal, customer relations would not be as severely threatened as the Interpace correspondence suggests. A reasonable juror also could conclude that the Class IV 6-gauge wire used in the pipe supplied to the City was not appreciably different from the Class IV 8-gauge wire that experienced the failures throughout the 1970s; many of the experts and Interpace memoranda spoke generally in terms of Class IV wire, without distinguishing between 6-gauge and 8-gauge wire.[7] Moreover, although it may be that Interpace never conclusively determined that the drawing process was the cause of the failures of the Class IV wire, there is abundant evidence that Interpace knew that its pipe was failing for some reason related to the Class IV wire. Finally, the City was not obligated to produce a witness confessing to fraud (nor was it obligated to support the inference of knowledge of fraud by demonstrating that *all* Interpace pipe was defective). "As [the Supreme Court of Virginia] has many times observed, it is not necessary that fraud should be expressly shown. It may be proved by circumstantial evidence, as was done here. And circumstances often speak louder than words." *Flanagan v. Parsons*, 167 Va. 6, 11, 187 S.E. 473, 475 (1936). Thus, we do not have a case in which the City presented evidence only that Interpace breached the contract. To the contrary, the City presented evidence from which a jury could have and did reasonably with justification conclude that Interpace knew of the falseness of its promise when

---

**6.** It is worth noting that although the percentage of pipe segments that failed was small, the more relevant percentage of Interpace customers that experienced a failure was, obviously, higher.

**7.** For largely the same reason, we reject the Pipe Defendants' separate argument that the district court should not have admitted evidence of failures of pipe that were not made from Class IV 6-gauge wire.

made.[8]

The City also presented evidence that it relied upon the Pipe Defendants' promise. A City engineer and an employee of WRA, the City's engineering firm, testified that they would not have recommended the pipes if not for Interpace's assurance that the pipes met the required standard.[9] The Pipe Defendants point to testimony that the decision to award the contract to Marbro did not depend on the fact that Interpace would be Marbro's supplier of pipe. The issue, however, is not whether the City cared that Interpace was the supplier; the issue is whether the City cared that the supplier would supply conforming pipe. The reliance relevant to the City's fraud claim is the City's reliance upon Interpace's representation that it would supply conforming pipe and the record establishes that the award of the contract to Marbro was dependant on an assurance that Marbro's supplier, who happened to be Interpace, would supply conforming pipe. Accordingly, we conclude that there was sufficient evidence to support the jury's finding of fraud.

### III

■ The next set of issues we address concerns GHA's contention that, for reasons independent of the Pipe Defendants' joint allegations of error, the judgment against GHA, as successor in interest to Interpace, cannot stand. It is well established that, "where one company sells or otherwise transfers all its assets to another company, the latter is not liable for the debts and liabilities of the transferor." 15 W. Fletcher, *Cyclopedia of the Law of Private Corporations*, § 7122, at 188 (rev.

perm. ed. 1983) [hereinafter Fletcher]; *see Elmer v. Tenneco Resins, Inc.*, 698 F.Supp. 535, 540 (D.Del.1988) (stating same rule); *Crawford Harbor Assoc. v. Blake Constr. Co.*, 661 F.Supp. 880, 883 (E.D.Va.1987) (same). However, the purchaser of assets can assume such liability either expressly or by implication. *See* Fletcher at § 7124; *Elmer*, 698 F.Supp. at 540; *Crawford Harbor*, 661 F.Supp. at 883. As the City acknowledges, the Assets Purchase Agreement between Interpace and GHA does not explicitly provide for GHA's assumption of Interpace's liabilities. However, at trial, the City argued that GHA's conduct indicates that GHA *implicitly* assumed Interpace's liabilities. The jury, in so concluding, ultimately awarded damages against GHA.

GHA supplies us with several bases for rejecting the City's argument. First, GHA claims that the evidence does not support a finding that it implicitly assumed Interpace's liabilities. Second, GHA argues that the district court's jury instructions on successor in interest liability were defective. Third, GHA argues that the district court lacked personal jurisdiction over it. Finally, GHA argues that the district court should not have allowed the jury to award punitive damages against GHA.

### A

■ GHA argues that there was insufficient evidence to support the conclusion that it implicitly assumed Interpace's liabilities. The City contends that "GHA's conduct demonstrated its intent to assume the executory Marbro/Interpace contract." Specifically, the City notes the following:

—— GHA called itself Interpace;

---

**8.** The Pipe Defendants construct a straw man when they note that although "it may be convenient to argue *today* that Interpace's wire drawing practices led to splitty wire . . ., no such neat conclusions could be, or were, reached in 1979–80." Obviously, if the City could prove only that the pipe that Interpace ultimately supplied did not conform to the contract, the City would not have proved fraud. *See Lissmann, supra.* However, the City presented abundant record evidence that at the time that Interpace made its promise to supply conforming pipe, Interpace believed that it had a serious problem whose origin was probably to be found in the Class IV wire.

**9.** Ray A. Jackson, Chief of Operations in the Department of Public Utilities, testified that "[i]f we had known that the wire did not meet the specifications, we would not have accepted the design nor would we have accepted the pipe." Kenneth A. McCord, a managing partner of WRA stated the obvious when he testified, "if I had known [the Class IV pipe was] defective, I would not have approved it."

— GHA publicly took credit for Interpace's work on the project;

— GHA assumed responsibility for completing the project;

— GHA made efforts to collect money under the project; and

— GHA participated in repairs to the City's spalled pipe.

The City also notes that some Interpace employees who were aware of the problems with the Class IV pipe remained with the transferred company after GHA acquired the assets. From this, the City concludes, GHA "perpetuated the continuing fraud." On appeal, the City argues that the evidence was sufficient to support a jury finding of successor in interest liability for Interpace's fraud.

We agree with the City that the evidence presented supports an inference of GHA's implicit assumption of liability. We share the view of the district court that a reasonable juror could, if he was so inclined, infer an assumption of liability from the assistance GHA supplied to fix the spalling problem. A reasonable juror could wonder why GHA would agree to assist in the spalling repair if it did not intend to assume liability for Interpace's work. Moreover, although Interpace was no longer in the pipe business, it continued to exist after GHA purchased its pipe assets. If GHA did not intend to assume liability, a reasonable juror could ask, why did it not direct the City to seek a remedy from Interpace? [10]

At trial, and before us, GHA offered evidence suggesting that GHA did not implicitly assume liability by assisting in the spalling repair. First, GHA presented evidence that it repaired the pipe not out of a sense of obligation but out of a desire to maintain good customer relations. Second, GHA offered a letter from GHA to Marbro in which GHA stated, "we do not feel GHA

Lock Joint is liable for the costs incurred in resolving this problem."

■ Although the facts favorable to GHA might give us pause if we were jurors, they do not long detain us, as an appeals panel, from finding a sufficient basis to support a reasonable jury inference. Fact finding, when there are conflicting alternatives, is for the jury. Though GHA claims that its sole intention in repairing the spalling problem was to maintain good customer relations, the jury was of course free to discredit the testimony. The jury was not obliged to accept a "goodness of the heart" explanation. As to the fact that GHA, in its letter to Marbro, had asserted that it was not liable for the spalling problem, close inspection of the letter reveals that the basis of GHA's position was unclear. GHA's position may, as GHA seems now to imply, have been based on a general stance that it was not liable for any of Interpace's errors. However, a contrary inference was quite possible. In the letter, immediately prior to GHA's disclaimer of liability, GHA stated, "we consider the primary cause of coating disruption is from unanticipated thermal effects.... [W]e cannot agree that the coatings are defective." A juror could reasonably interpret the letter to mean not that GHA refused to assume Interpace's liabilities, but that GHA merely felt that the spalling was not the fault of anything Interpace did. Indeed, if GHA did not intend to assume Interpace's liabilities, it would not have needed to engage in a discussion about whether the spalling resulted from something for which Interpace would have been liable. Thus, we reject GHA's contention that there was insufficient evidence to support a finding that it implicitly assumed Interpace's liabilities. [11]

---

10. Although we rest our decision primarily on the fact that GHA agreed to perform the spalling repairs, we note further that Marbro's approaching GHA about the spalling suggests that Marbro was under the impression that GHA had assumed Interpace's liabilities. GHA's observation, unsupported by the record, that Marbro contacted GHA because Interpace was no longer in the pipe business, is unresponsive to the question of whether Marbro's contacting GHA

represents Marbro's impression that GHA had assumed Interpace's liabilities.

11. The parties are in dispute as to whether GHA's liability *vel non* as a successor in interest is governed by Virginia law or Delaware law. We need not resolve the issue because, as our citations indicated above, both jurisdictions adhere to the general rule regarding such liability. *See Elmer*, 698 F.Supp. at 540 (Delaware law);

## B

GHA makes two different arguments regarding the district court's jury instructions on successor in interest liability. First, GHA alleges error in the district court's refusal to grant GHA's Charge No. 33, which was intended to provide the jury with guidance for the implicit assumption of liability issue.[12] GHA's second allegation of error relates to the following instruction given by the district court:

> If the City has proved by a preponderance of the evidence that it was damaged by the fraud of Interpace, Madison Management Group, or GHA Lock Joint, the City is entitled to recover such damages from Madison and GHA as will compensate it....

GHA alleges that the court's remark could have implied to the jury that if it found that the City was damaged by Interpace's fraud, it automatically should award damages against GHA. That implication, GHA argues, fails to account for the fact that liability against GHA was proper only if the jury was persuaded that GHA implicitly assumed Interpace's liabilities.

The City argues that the overall instructions received by the jury adequately alerted the jury to the salient aspects of the successor in interest liability issue. *See* *Spell v. McDaniel*, 824 F.2d 1380, 1395 (4th Cir.1987) ("test of adequacy of instructions ... is simply the practical one of whether the instructions construed as a whole, and in light of the whole record, adequately informed the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of the objecting party"), *cert. denied*, 484 U.S. 1027, 108 S.Ct. 752, 98 L.Ed.2d 765 (1988). The City asserts that "the jury was instructed on the principles which underlie corporate successor liability." The firmest support for the City's position is found in the district court's instruction as to the possibility of GHA liability for purposes of the City's breach of contract claim against the Pipe Defendants. The court instructed the jury:

> If you find that, by its conduct and representations, GHA ... implied or assumed the obligations, responsibilities, and opportunities of Interpace under the contract by which Interpace made and delivered the pipe, then GHA ... is liable for the breach of the contract to the same extent as Interpace.

■ The City also argues that GHA did not preserve its objection to the jury instructions on implicit assumption of liability. As the City points out, although GHA presented its requested instruction 33 to the district court, it did not take advantage of its opportunity to object to the district court's decision not to grant the requested instruction.[13] The City further points out that although GHA objected to that portion of the jury charge that, in GHA's view, implied that a finding of fraud by Interpace

---

*Crawford Harbor,* 661 F.Supp. at 883 (Virginia law). In urging that Delaware law governs, GHA seeks to benefit from *Fountain v. Colonial Chevrolet Co.,* Nos. 86C–JA–117 & 85C–DE–88, 1988 WL 40019, 1988 Del.Super. (available on LEXIS), where the Delaware Superior Court commented, "Simply, this Court fails to see how the successor's agreement to conclude the work left outstanding by its predecessor at the time of the sale of the corporation evinces an intent on the part of the successor to assume the corporate liabilities of the sellers." *Id.* at 22. In addition to noting that the determination of when a successor has implicitly assumed liabilities is necessarily fact-bound, *see* Fletcher at § 7124, we distinguish *Fountain* on the grounds that there was evidence that GHA not only continued work on an ongoing project but agreed to subsidize the spalling repairs in the face of a possible threat of liability.

**12.** The proposed charge read:

> Simply because GHA purchased Interpace's pipe manufacturing assets in July 1981 does not make GHA liable for any breach of contract or fraud by Interpace. To recover damages against GHA for any such breach of contract or fraud by Interpace, the City must prove that GHA, by its conduct or representations, impliedly agreed to assume the liability for Interpace's actions. In determining whether GHA agreed to assume such liability you should also consider the terms of the July 1981 assets purchase agreement between Interpace and GHA.

App. at 368B.

**13.** The district court held a hearing on its proposed jury instructions. The district court also held a very brief side bar conference after it charged the jury but before the jury retired. The Pipe Defendants had the opportunity, which they did not seize, to object on both occasions.

was, without more, enough to support liability against GHA, GHA's objection was not on the grounds made on appeal. GHA objected only to the "language about fraud," which it considered to be "argumentative"; GHA did not object to the instruction's alleged suggestion that liability of GHA followed directly from fraud by Interpace.

We first address the City's contention that GHA has failed to preserve its objection to the jury instructions. Our analysis begins with Fed.R.Civ.P. 51, which provides, in pertinent part:

> No party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection.

There is no doubt that GHA did not comply with Rule 51. However, GHA may find refuge in Fed.R.Civ.P. 46, which provides:

> Formal exceptions to rulings or orders of the court are unnecessary; but for all purposes for which an exception has heretofore been necessary it is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which the party desires the court to take or the party's objection to the action of the court and the grounds therefor; and, if a party has no opportunity to object to a ruling or order at the time it is made, the absence of an objection does not thereafter prejudice the party.

Courts have held that Rule 51 must be read in conjunction with Rule 46. *See, e.g., Perkinson v. Gilbert/Robinson, Inc.,* 821 F.2d 686, 693 (D.C.Cir.1987); *Brown v. Avemco Inv. Corp.,* 603 F.2d 1367, 1370–71 (9th Cir.1979). Those courts have reasoned that where "the district court was fully aware of the plaintiff's position," and the district court had obviously considered and rejected that position, strict enforcement of Rule 51 would "exalt form over substance." *Brown,* 603 F.2d at 1371; *see also Perkinson,* 821 F.2d at 693–94 (to find waiver where court had obviously finally decided the matter " 'would be an unneces-

sary elevation of form over substance.' ") (citation omitted). One commentator has summed up the law as follows:

> The failure to object may be disregarded if the party's objection has previously been clearly made to the court and it is plain that a further objection would be unavailing.

9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2553, at 639–40 (1971).

 Even giving Rule 51 the more relaxed application that Rule 46 suggests, we find that GHA has not preserved its objections to the jury charge. As to the district court's decision not to give GHA's proposed instruction No. 33, GHA offers only its conclusory assertion of the legal standard that "Appellants did everything necessary to preserve their position and further objection would have been futile." We find nothing in the record to support such a conclusion. There is no evidence of extended, or indeed any, argument on the issue. Nothing in the colloquy between court and counsel suggests that the court was hostile to the notion of a jury instruction precisely defining the requirements for successor in interest liability on the City's fraud theory. Indeed, we find it more reasonable to infer from the absence of any such instruction that the omission of such an instruction represented district court oversight, not district court entrenchment. The district court was afforded by GHA no opportunity to correct the supposed error. Where, as here, a party who has violated Rule 51 can point to nothing more than the court's denial of a requested instruction, a reading of Rule 51 loose enough to permit preservation of the point would effectively delete Rule 51 insofar as allegations of error in the failure to give an instruction are concerned. Similarly, as to the district court's alleged implication that fraud by Interpace should lead directly to GHA liability, we again find waiver due to the absence of any indication in the record that any objection was made, to say nothing of a showing that further objection would have been futile. The objection to other portions of the sentence containing the alleged implication did

not alert the district court to the complaint that GHA now advances on appeal.

Contrary to GHA's suggestion on brief, our enforcement of Rule 51 does not constitute the "emphasizing [of] meritless technicalities." "The purpose of Rule 51 is to 'prevent unnecessary new trials because of errors the judge might have corrected if they had been brought to his attention at the proper time.'" *Industrial Dev. Bd. of Section, Ala. v. Fuqua Indus.*, 523 F.2d 1226, 1238 (5th Cir.1975) (citing *Cohen v. Franchard Corp.*, 478 F.2d 115, 122 (2d Cir.), *cert. denied*, 414 U.S. 857, 94 S.Ct. 161, 38 L.Ed.2d 106 (1973)). The rule constitutes a particular expression of the adversarial theory of justice in which litigants (or, more precisely, their counsel) are to play a central role in generating correct resolutions of disputes. The burden on counsel takes on a special importance where, as here, the case is very complex; for as a case's complexity increases, so does the probability that a district court may, in the pressures of trial, overlook something. We feel particularly comfortable enforcing Congress' decision as expressed in Rule 51 to impose that burden where, as here, a litigant is represented by very able, and numerous, counsel.

The looseness with which some courts, properly, have interpreted Rule 51 remains faithful to the rule's purpose of ensuring that the parties have given the trial judge a chance to resolve disputed issues relating to jury instructions. The requirement for technical compliance with the rule is waived "[o]nly when the appellate court is sure that the trial court was adequately informed as to a litigant's contentions." *Industrial Dev. Bd.*, 523 F.2d at 1238. Thus, although we will relax Rule 51 where to do so will not contravene the rule's purpose, we will not do so where a party has merely conclusorily asserted that further objection would have been futile. We conclude that GHA has waived its right to object to the jury instructions and, accord-

ingly, we need not address the merits of the objections.[14]

## C

GHA asserts that the district court lacked personal jurisdiction over it. As GHA must concede, Interpace committed sufficient acts within Virginia to support personal jurisdiction over Interpace. However, GHA argues, *GHA* committed no affirmative acts giving rise to personal jurisdiction and a Virginia court cannot automatically assert jurisdiction over GHA merely because GHA purchased Interpace's pipe manufacturing assets.

"The great weight of persuasive authority permits imputation of a predecessor's actions upon its successor *whenever* forum law would hold the successor liable for its predecessor's actions." *Simmers v. American Cyanamid Corp.*, 576 A.2d 376, 385 (Pa.Super.1990) (emphasis original). *See Crawford Harbor*, 661 F.Supp. at 883 (applying Virginia law) ("If the successor is to stand thus in the place of the predecessor, it must do so for all purposes, including personal jurisdiction in the first instance."); *Duris v. Erato Shipping, Inc.*, 684 F.2d 352, 356 (6th Cir.1982) (applying Ohio law), *aff'd sub nom.*, *Pallas Shipping Agency, Ltd. v. Duris*, 461 U.S. 529, 103 S.Ct. 1991, 76 L.Ed.2d 120 (1983); *Explosives Corp. v. Garlam Enters. Corp.*, 615 F.Supp. 364, 367 (D.P.R.1985) (applying general principles without identifying state of origin), *cause dismissed*, 782 F.2d 1023 (1st Cir. 1985); *Maryland Nat'l Bank v. Shaffer Stores Co.*, 240 F.Supp. 777, 780 (D.Md. 1965) (applying Maryland law). *But see Johnston v. Pneumo Corp.*, 652 F.Supp. 1402, 1406 (S.D.Miss.1987) ("This Court declines to hold that contacts with a forum may be attributed or imputed to a successor corporation simply because that corporation purchases assets and liabilities" of predecessor that was subject to personal jurisdiction). As the district court ob-

---

14. We recognize that "an appellate court may reverse for plain error where necessary to prevent a miscarriage of justice despite the [appellant's] failure to comply with Rule 51." *Appleyard v. Transamerican Press, Inc.*, 539 F.2d 1026,

1031 (4th Cir.1976) (Butzner, J., concurring) (citations omitted), *cert. denied*, 429 U.S. 1041, 97 S.Ct. 740, 50 L.Ed.2d 753 (1977). However, we do not think the district court's error, if any, rose to the level of a miscarriage of justice.

served, "the wholesomeness of that rule is apparent on its face. Every corporation who puts out a lousy product like was done here would avoid all consequences of it by just reforming in some other jurisdiction and avoiding any accountability on it." *See Duris*, 684 F.2d at 356 ("Any other ruling would allow corporations to immunize themselves by formalistically changing their titles."). Because, as concluded above, there was evidence supporting the imposition upon GHA of successor liability, it was proper for the district court to assert personal jurisdiction over GHA.[15]

## D

■■ GHA argues that even if the award of compensatory damages against GHA is allowed to stand, the several award of punitive damages against it should be overturned because "no independent act of fraud by GHA was either alleged or proven." GHA argues that, in such a case as we have here, the punitive damages award does not serve the primary purposes of such damages, namely, punishment and deterrence. *See F.B.C. Stores, Inc. v. Duncan*, 214 Va. 246, 251, 198 S.E.2d 595, 599 (1973) ("The function of punitive or exemplary damages is to punish the defendant for malicious conduct or to display to others an example of the consequences they may expect if they engage in similar conduct."). Specifically, GHA points out that it no longer sells pipe made with the Class IV wire giving rise to the cause of action in this case[16] and that, if any fraud was committed, it was committed by Interpace, not by GHA.[17]

We see no error in the jury's award of punitive damages against GHA. We first note that the weight of authority is against GHA because most courts addressing the issue have held that if a successor in interest is liable for its predecessor's torts, it is subject to punitive damages for those torts. *See Man v. Raymark Indus.*, 728 F.Supp. 1461, 1469 (D.Haw.1989) (Hawaii statute providing that entity surviving merger acquires "all of the liabilities" of constituent corporations interpreted to include liabilities for "claims for punitive damages"); *Krull v. Celotex Corp.*, 611 F.Supp. 146, 149 (N.D.Ill.1985) (in context of merged entity's liability for merged-out predecessors, there is "no authority for treating punitive damages differently from any other liability"); *Wall v. Owens–Corning Fiberglas Corp.*, 602 F.Supp. 252, 255 (N.D. Tex.1985) (where purchasing corporation impliedly assumes the transferor corporation's tort liabilities, "tort claims include those for punitive damages"); *Hanlon v. Johns–Manville Sales Corp.*, 599 F.Supp. 376, 379 (N.D.Iowa 1984) ("the status of Celotex as a successor corporation does not prevent it from being subjected to punitive damages for the acts of its predecessors"); *Thomas v. E.J. Korvette, Inc.*, 329 F.Supp. 1163, 1169–70 (E.D.Pa.1971) (where successor has assumed liabilities of predecessor, "[t]here is no reason why punitive damages should not also be included"), *rev'd on other grounds*, 476 F.2d 471 (3d Cir.1973); *Western Resources Life Ins. Co. v. Gerhardt*, 553 S.W.2d 783, 787 (Tex.Civ.App. 1977) (where successor corporation is found to be responsible for predecessor's liabili-

**15.** There is some doubt as to whether GHA waived its right to assert its personal jurisdiction argument by seeking affirmative relief from the court. *See Merz v. Hemmerle*, 90 F.R.D. 566, 569 (E.D.N.Y.1981) (describing the split in authority). However, because we reject GHA's argument on the merits, we need not rule on GHA's right to make the argument. Nor need we address the City's argument that GHA itself committed sufficient Virginia acts to support jurisdiction by allegedly perpetuating, in Virginia, Interpace's fraud.

**16.** Indeed, Interpace stopped producing the pipe even before GHA purchased Interpace's assets.

**17.** GHA also argues that punitive damages were erroneous because no damages should have been allowed on the City's economic loss theory. Because we have held that the City was entitled to damages for economic loss, GHA's argument on the point fails. GHA further alleges error in the damage award because the City's cause of action was really in contract and punitive damages are not allowable on a contract action. However, we have held that the City's claim was indeed in tort, not merely in contract, and thus the City's case falls within the rule of *Kamlar*, *supra* (punitive damages allowable where there is "proof of an independent, wilful tort, beyond the mere breach of a duty imposed by contract").

ties, that responsibility extends to exemplary damages). *But see Drayton v. Jiffee Chem. Corp.*, 591 F.2d 352, 356 (6th Cir. 1978) (later narrowed by *Moran v. Johns–Manville Sales Corp.*, 691 F.2d 811, 816–17 (6th Cir.1982)).

The holdings of these cases are aptly applied to the facts before us. We disagree with GHA that the deterrence value of a punitive damage award is lost if applied to a successor in interest who no longer commits the wrongful act sanctioned by the award. In Virginia, the purpose of a punitive damage award is not simply to deter the wrongdoer from future wrongdoing; it is "to display *to others* an example of the consequences *they* may expect if they engage in similar conduct." *F.B.C. Stores*, 214 Va. at 251, 198 S.E.2d at 599 (emphasis added). That purpose is served equally well irrespective of whether the award is imposed on the actual wrongdoer or the wrongdoer's successor in interest. GHA's request for punitive damage immunity on the ground that Interpace, and not it, committed the fraud also overlooks the undesirability of allowing an entity to escape liability for punitive damages by transferring its assets to another entity. Thus, we affirm the punitive damages award against GHA.[18]

## IV

The jury returned its verdict on special answer forms. The jury indicated that it found (a) Marbro not liable for breach of contract, (b) the Pipe Defendants liable for breach of contract but not liable for any damages for the breach and (c) the Pipe Defendants liable for fraud for a substantial amount in damages. The Pipe Defendants argue that the verdicts were irreconcilable and a new trial is necessary.

When, "if viewed in the most generous way, the answers [to special interrogatories] are inconsistent with each other, a new trial is ordinarily required." *Ladnier v. Murray*, 769 F.2d 195, 198 (4th Cir.1985).

"Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way. For a search for one possible view of the case which will make the jury's finding inconsistent results in a collision with the Seventh Amendment." *A. & G. Stevedores v. Ellerman Lines, Ltd.*, 369 U.S. 355, 364, 82 S.Ct. 780, 786, 7 L.Ed.2d 798 (1962). With those principles in mind, we now examine each of the Pipe Defendants' allegations of verdict inconsistency.

### A

The Pipe Defendants first contend that the fact that the jury concluded that Marbro did not breach its contract with the City cannot be squared with the jury's finding of fraud by Interpace. The claims underlying the findings, the Pipe Defendants argue, "were each based on the same factual premise—that the pipe manufactured by Interpace and supplied by Marbro did not meet the specifications of both the Project contract and the Pipe contract.... It is not possible that the pipe both met and failed to meet contract specifications at the same time." Yet, the argument runs, if there was no breach of contact, the conclusion must be that there was no failure to meet contract specifications.

At trial, Marbro presented evidence that it was under no duty to ensure that the pipe supplied by Interpace met contract specifications. Ray A. Jackson, Chief of Operations in the Department of Public Utilities, testified as follows:

Q. [I]t is not customary for the general contractor to conduct independent testing that would lead to the discovery of [a pipe] defect, is it?

A. Not unless it were required in the specifications, which was not true in this case.

James Marshal VanDeusen, an expert in "customs in the industry with respect to

---

**18.** Although the Pipe Defendants advance the alleged impropriety of punitive damages against a successor in interest primarily on behalf of GHA, they make a similar argument on Madison's behalf. Our conclusion that punitive damages are permissible applies to Madison just as it does to GHA.

shop drawings and manufacturers certification," testified as follows:

A. [S]hop drawings and certifications are typically furnished to the contractor from the manufacturer, and they are transmitted to the owner.

Q. And what role does the contractor play in that process, typically?

A. Just a transmitter of the pipe or conduit to get it from the manufacturer to the owner.

Q. And have you ever known a contractor to conduct independent testing of prestressing wire and concrete pipe such as prestressed concrete pipe?

A. Never.

In closing argument, Marbro's counsel argued:

Not one witness has said or implied that Marbro Company knew anything about the prestressing wire in this pipe, or that Marbro Company could have tested the pipe to determine its quality.

Later in closing argument counsel continued:

So then why didn't Marbro breach the contract? Because we didn't test the wire in the pipe[.] I have told you that it is absolutely incredible to think that we would have to do something like that; both [two other witnesses] testified to that as well as our witnesses.

Taking the generous approach to the jury's findings that we are required to take, we conclude that the jury was entitled to find that, while the pipe was defective, Marbro was not a guarantor of the pipe's quality. That view of the verdict indicates no inconsistency between a finding that Interpace had committed fraud for knowingly supplying defective pipe and a finding that Marbro was not liable because it did not guarantee the pipe against defects.

The Pipe Defendants counter that the contract between Marbro and the City provided that Marbro "shall guarantee all the work furnished under this Contract against any defects in workmanship and materials." Therefore, they argue, it would have been legally erroneous for the jury to reason, as we have suggested, that Marbro

was not a guarantor of the Interpace pipe. However, the guarantee provision in the contract extends only for "a period of one year following the date of final acceptance of the work by the Owner." *Id.* Therefore, the jury could have believed that even if Marbro did have some limited duty to guarantee the pipe, that duty was too limited to cover the pipeline bursts.

**B**

The Pipe Defendants next contend that the jury's decision to award damages for fraud cannot be squared with its decision not to award damages for Interpace's breach of contract. "Any injury or damage from the fraud *could only* arise," they argue, "from a breach of the contracts—yet the jury found no damages to the City for any breach, but $5 million against Madison and GHA in damages for fraud."

At trial, the Pipe Defendants argued that the City stepped into Marbro's shoes and was subject to the limitation of warranty provisions in the contract between Marbro and Interpace. The district court instructed the jury that if it "determine[d] that Madison or GHA is liable to the City for the damages on the City's claim for breach of contract, you must then consider whether [the limitation of warranty provisions] of the contract between Interpace and Marbro limits the damages the City may recover." On that approach, the City argues, the jury's decision not to award breach of contract damages despite its finding of fraud merely indicates that the jury found that the City's recovery in contract was limited by the limitation of warranty provision referred to by the court during the jury charge and, therefore, the jury declined to award any damages for breach of contract. That, the City posited, left damages for fraud untouched.

In response, the Pipe Defendants point out that the district court instructed the jury that "[t]erms of a contract which limit liabilities or remedies are not enforceable if the parties seeking to enforce the limitation have committed fraud." In light of this instruction, the Pipe Defendants argue, the

limitation of liability provision cannot explain the jury's decision to award fraud damages without awarding contract damages because the jury's finding of fraud should have led it to find the limitation provision inapplicable.

In assessing the parties' contentions, "we are bound by the rule that a special verdict must be construed in light of the surrounding circumstances, including the instructions of the court." *Wright v. Kroeger Corp.*, 422 F.2d 176, 178 (5th Cir.1970). The court's instruction, which neither the City nor the Pipe Defendants have challenged on appeal, stated that the limitation provision was unenforceable if the party *"seeking to enforce* the limitation has committed fraud." (Emphasis added.) Giving the jury verdict the generous view mandated by the Seventh Amendment to the United States Constitution, we conclude that the jury applied the limitation of liability provision despite its finding of fraud because it interpreted the court's instruction as preventing enforcement of the limitation only if *one of the Pipe Defendants* had committed fraud. *See Silverberg v. Paine, Webber, Jackson & Curtis, Inc.*, 710 F.2d 678, 685 n. 10 (11th Cir.1983) ("a jury verdict inconsistent on its face does not require a new trial if the inconsistency may reasonably be attributed to the jury's misunderstanding of the jury instruc-

tions."). Although the jury apparently understood the concept that underlying liability could be passed from Interpace to the Pipe Defendants, it does not necessarily follow that the jury understood that fraud by Interpace was to be imputed to the Pipe Defendants *for purposes of the prohibition against enforcement of the limitation of liability provision when a party has committed fraud.*[19]

The fact that the City presented evidence intended to show that GHA itself committed fraud supports our conclusion as to how the jury understood the court's instruction on the implications of fraud for the limitation of liability provision. It would not be unusual for the jury to construe the court's instruction as meaning that GHA cannot hide behind the limitation of liability if the jury believed the City's evidence that GHA itself committed fraud. Having apparently rejected the City's contention that GHA itself (rather than Interpace) committed fraud the jury permitted GHA (and Madison) to benefit from the limitation of liability insofar as the contract aspects were concerned. Accordingly, we reject the Pipe Defendants' claims that the jury verdict is irreconcilable.[20]

## V

During *voir dire*, the district court asked the jury panel, "How many of you are

---

**19.** As noted above, the Seventh Amendment requires that our mission be limited to determining whether "there is a view of the case that makes the jury's answers to special interrogatories *consistent." A. & G. Stevedores*, 369 U.S. at 364, 82 S.Ct. at 786 (emphasis added). Thus, it is of no moment, for purposes of our irreconcilability analysis, that the jury's interpretation of the court's instruction may have been legally incorrect. The law provides other avenues for curing jury instructions that mislead the jury. To the extent our interpretation of the jury's reasoning suggests that the jury misinterpreted the law (a point we do not decide), it may seem troubling to acknowledge a jury's misinterpretation of the law in one breath and affirm that jury's verdict in the next; however, as far as irreconcilability is concerned, our inquiry ends when, after viewing all the surrounding circumstances, we conclude that the jury's verdict is "consistent."

**20.** The parties are in dispute as to whether the forms presented to the jury called for a special verdict, governed by Fed.R.Civ.P. 49(a), or a

general verdict accompanied by answers to interrogatories, governed by Fed R.Civ.P. 49(b). If, as the City contends, Rule 49(b) governs, then the Pipe Defendants have waived their right to argue irreconcilability because they did not "object to any asserted inconsistencies in the response to jury interrogatories prior to the discharge of the jury." *White v. Celotex*, 878 F.2d 144, 146 (4th Cir.) (court decides not to hear allegation of error on Rule 49(b) form due to failure to object below), *cert. denied,* —— U.S. ——, 110 S.Ct. 406, 107 L.Ed.2d 372 (1989). If, as the Pipe Defendants contend, Rule 49(a) governs, there is no established authority requiring the Pipe Defendants to object prior to discharge of the jury. Because we reject the Pipe Defendants' argument on the merits, we need not decide either (a) whether the form at issue was a Rule 49(a) form or a Rule 49(b) form or (b) whether the rule requiring objection in the Rule 49(b) context should also apply in the Rule 49(a) context.

customers of the City of Richmond for your water needs?" Beatrice Poteat, who ultimately served on the jury, did not respond even though she was such a customer. After trial, the Pipe Defendants moved for a new trial on the grounds that Poteat's service on the jury deprived them of a fair trial. The district court denied the motion.

▮▮▮▮ "It is well settled that a district court's determination on a motion for either a new trial or relief from judgment because a juror failed to fully disclose information during *voir dire* is reversible only for either an abuse of discretion or a clear error of law in the exercise of this discretion." *McCoy v. Goldston,* 652 F.2d 654, 657 (6th Cir.1981). Two considerations lead us to believe that the Pipe Defendants can demonstrate neither an abuse of discretion nor a clear error of law. First, the Pipe Defendants could have discovered that Poteat's answer was false before trial because they were given a list of the jurors' addresses. We cannot find that the district court abused its discretion by not excusing the Pipe Defendants' failure to act earlier on the information available to them. If "the right to challenge a juror is waived by failure to object at the time the jury is empaneled if the basis for objection might have been discovered during *voir dire,*" *Robinson v. Monsanto Co.,* 758 F.2d 331, 335 (8th Cir.1985), such a right surely is waived if the basis could have been discovered before *voir dire.* Second, it seems unlikely that a truthful answer from Poteat would have changed the proceedings in any appreciable way. The district court stated that even if he had learned that Poteat was a city water customer, he would not have disqualified her for cause. To win its new trial motion, the Pipe Defendants would have to "show that a correct response

would have provided a valid basis for a challenge for cause." *McDonough Power Equipment, Inc. v. Greenwood,* 464 U.S. 548, 556, 104 S.Ct. 845, 850, 78 L.Ed.2d 663 (1984). Because the district court would not have considered a truthful response by Poteat to justify a strike for cause (and we would have found no abuse of discretion in such a holding), Poteat's failure to answer, even if treated as a false answer, does not entitle the Pipe Defendants to a new trial.

## VI

▮▮▮▮ The district court admitted evidence of the fact that Interpace stopped using pipe made of Class IV wire after the pipe sold to the City was installed. The Pipe Defendants allege error in that admission because the evidence was prejudicial as it tended to show that the pipe was defective. The admission, they claim, violated Fed.R.Evid. 407, which prohibits admission of evidence of subsequent remedial measures to show culpability.

Rule 407 provides, in part:

When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event.

To determine whether the admission of evidence of Interpace's decision to stop using pipe made with Class IV wire violated Rule 407, we must identify the "event" after which the remedial measures were taken. The Pipe Defendants argue that the "event" is the sale of the Class IV pipe to the City. The City counters that the "event" is the actual bursting of the pipe.[21]

---

**21.** Both parties point out that their opponent's position with respect to the issue is inconsistent with the rest of their opponent's case. Thus, the City points out that it is inconsistent for the Pipe Defendants to characterize the decision to stop producing pipe with Class IV wire as "remedial" because "the Pipe Defendants contended throughout trial that the wire and the pipe had no defects and were in no need of replacement or repair." Not to be outdone, the Pipe Defendants argue that "[a]ccording to the City's own theory of its case, Interpace's liability sprang

from the manufacture and delivery of defective pipe. Thus, the relevant 'event' for Rule 407 purposes was the manufacture and delivery of that pipe, which predated Interpace's discontinuance of Class IV wire."

We think that, although it may supply fodder for off-handed broadside attacks directed at an opponent, inconsistency between a party's overall theory of its case and its Rule 407 argument is an improper basis for resolving Rule 407 disputes. *Cf. Probus v. K–Mart, Inc.,* 794 F.2d 1207, 1210 (7th Cir.1986) (mere fact that defen-

Resolution of the question is dispositive because, if the event was the ˙sale of the pipe, the remedial measure was "subsequent" and therefore evidence of it was inadmissible, while if the event was the *bursting* of the pipe, the remedial measure was not "subsequent" and therefore evidence of it was admissible.

We agree with the City that the relevant "event" is the bursting of the pipe and the evidence is therefore admissible. In *Chase v. General Motors Corp.,* 856 F.2d 17 (4th Cir.1988), a car crash victim sued an automobile manufacturer for negligence. In analyzing a Rule 407 issue, we observed that the relevant "event" was the date of the accident. *Id.* at 21. *Chase* is not squarely on point because the remedial measure occurred after both the date of the car sale and the date of the car accident. The question presented did not turn on whether the sale or the accident was the Rule 407 event. However, the Fifth Circuit encountered that nuance in *Rozier v. Ford Motor Co.,* 573 F.2d 1332 (5th Cir.1978). There, a car manufacturer had taken a remedial step between the date of the sale of a car and the date of the car's accident. The court held that evidence of such a remedial measure was admissible because, in part, the Rule 407 event was the car accident, not the car sale. *Id.* at 1343. Applying the case law, we conclude that the "event" was the bursting of the pipes and the remedial measure was, therefore, prior to the event. Accordingly, we find no violation of Rule 407.[22]

### VII

The jury received a separate verdict form for each of the two Pipe Defendants. On each form, the jury was first asked whether it found for the City on the fraud claim against the respective defendant. On each

form, the jury responded "yes." The form then asked: "If for the City, what damages do you award the City?" On each form, the jury responded: "$5,000,000.00." The jury also awarded the City $500,000 in punitive damages on each form.

After the jury delivered its verdict and was excused, the parties requested a clarification of the verdict pursuant to Fed.R. Civ.P. Rule 59(e), governing motions "to alter or amend a judgment," or Fed.R. Civ.P. 60(a), governing "clerical mistakes." The Pipe Defendants claimed that the jury intended to award a total of $5,000,000 in compensatory damages, jointly and severally against the Pipe Defendants. The City argued that the jury intended to award $10,000,000 in compensatory damages, jointly and severally against the Pipe Defendants.

The district court agreed with the City. The court commented that "[t]he jury received no instructions on joint and several liability, and, therefore, they had no reason to think that Madison and GHA would be liable for one lump sum. Also the verdict forms, by providing separate blanks for damages against each defendant, contributed to the jury's impression that it was awarding damages separately against each defendant." From this, the court concluded, "even without considering the evidence on damages, the jury's intent is clear, and I have no difficulty in aggregating the damages...." The court then entered judgment for the City in the amount of $10,-000,000 jointly and severally against the Pipe Defendants and "separate awards of punitive damages each in the amount of $500,000 against" Madison and GHA. The Pipe Defendants have appealed the aggregation award.

---

dant denies negligence is not enough to satisfy impeachment exception to Rule 407). To hold that a defendant cannot advance a Rule 407 argument without admitting to a defect in his product or that a plaintiff cannot rebut a Rule 407 argument without forgoing a claim that he was previously wronged would run counter to the principle that parties are allowed to argue in the alternative.

**22.** If we were to accept that the fraud of promising conforming pipe with the knowledge that it could not be delivered was the "event," the Pipe Defendants' Rule 407 argument might still fail on the grounds that halting production of pipe made with Class IV wire was not a remedial action. The decision not to produce additional pipe could not reasonably be said to remedy Interpace's fraud.

A district court may aggregate verdicts without violating the seventh amendment right to a jury trial if the verdicts are " 'logical and probable' only if they are aggregated." *Schutzky Distributors, Inc. v. Kelly*, 643 F.Supp. 57, 62 (N.D. Cal.1986) (citing *Griffin v. Matherne*, 471 F.2d 911 (5th Cir.1973)). The requirement that aggregation occur only if the aggregated verdict is what the jury *must* have intended stems from the fact that a district court's reexamination of record evidence is barred by the Seventh Amendment. *See Aquachem Co. v. Olin Corp.*, 699 F.2d 516, 520 n. 2 (11th Cir.1983). Therefore, we must determine whether the district court correctly concluded that the jury's verdict is logical and probable only if aggregated.

Unlike the district court, we cannot infer that the mere fact that the jury did not receive instructions on joint and several liability leads inexorably to the conclusion that the jury intended an aggregated award. The verdict form simply asked, "What damages do you award the City?" It is possible that the jury simply inserted the amount that the City was damaged and assumed that the court would later figure out how to apportion that amount among the liable defendants. Nor does the fact that there were separate verdict forms for each defendant, the other basis of the district court's aggregation reasoning, supply the evidence necessary to convince us that the jury intended a joint and several award of $10,000,000. As has been noted by other courts, in cases where multiple defendants are being subjected to liability for a single injury, use of verdict forms that ask how much the jury awards against each defendant rather than how much the plaintiff has been damaged creates a risk of ambiguity. *Faison v. Nationwide Mortgage Corp.*, 839 F.2d 680, 688–89 (D.C.Cir. 1987) ("In light of the severe limitations inherent in a resort to special verdict forms, we urge extreme caution in their use where multiple defendants are involved."), *cert. denied*, 488 U.S. 823, 109

S.Ct. 70, 102 L.Ed.2d 46 (1988); *Aldrich v. Thomson McKinnon Securities, Inc.*, 756 F.2d 243, 248 (2d Cir.1985) ("The confusion arises from the fact that the special interrogatories submitted to the jury invited them to answer separately as to each defendant the amount of compensatory damages to be recovered by plaintiff."); *Gagnon v. Ball*, 696 F.2d 17, 19 n. 2 (2d Cir. 1982) ("[S]ince the problem may recur, we note the inadvisability of the procedure used.").

The City's arithmetic gymnastics have not persuaded us otherwise. The City argues that the jury must have intended to award $10,000,000 because the City asked for $11,000,000 in damages and the jury was instructed to perform a present value calculation. Thus, the City argues, the jury must have taken the $11,000,000 figure and reduced it for present value purposes. However, the City actually asked for $11,508,425.85, not $11,000,000. The added half million dollars makes the present value theory less persuasive as an unambiguous explanation of the discrepancy between the amount for which the City asked and the amount that the City claims the jury intended to award. Moreover, the uncertainties of a present value calculation, particularly where there is no indication as to what kind of formula the jury could have used, provide far too infirm a basis for concluding that the jury's verdict is logical and probable only if aggregated.[23] Finally, the Pipe Defendants have buttressed their argument by pointing to several hypothetical explanations for the jury's verdict that we consider to be no less far-fetched or tortured than the City's proposed explanation.

We think that the jury's award is simply ambiguous. Just as we find erroneous the district court's decision that the jury definitely intended to award $10,000,000, we would have found the opposite conclusion, *i.e.*, that the jury definitely intended to award only $5,000,000, equally erroneous.

23. The City's argument recalls to mind the cartoon in which the math professor stands in front of a huge blackboard filled with a maze of unintelligible formulas connected by winding arrows and then, while pointing to the conclusion in which his calculations culminate, declares, "You see, it's obvious."

Unfortunately, neither the Pipe Defendants nor the City alerted the district court to the ambiguities that would arise from the forms used.[24] In light of the ambiguity, we believe that a new trial limited to compensatory damages is in order. As intriguing as may be the possibility of confining the damage award on remand to an upper or lower limit, there are also substantial difficulties attendant upon doing so, and we decline to impose such constraints on the remand jury's discretion. Thus, the new jury shall be free to award whatever amount it finds the City to have been damaged, even if it finds, with supporting evidence, that amount to be less than $5,000,000 or more than $10,000,000.[25]

### VIII

 The final issue that we must resolve regards the conditional cross-appeals of Marbro and the City. Marbro has asked not to be included in any proceedings on remand. At oral argument, the City appropriately recognized that inclusion of Marbro would be appropriate only if a new trial was to be based on juror bias or verdict inconsistency. We have affirmed those aspects of the case as well as all other issues that could bear on liability. The remand we have ordered concerns only the damages to be awarded against the Pipe Defendants and Marbro's presence in such a proceeding would serve no purpose. The fact that we have affirmed all issues relating to liability also leads us to deny the City's request to proceed against the Pipe Defendants on its constructive fraud theory.

### IX

In summary, the jury's finding of liability for fraud against Madison and GHA is affirmed. The jury's punitive damage award of $500,000 against each Pipe Defen-

dant also is affirmed. Because the jury's compensatory damage award is ambiguous, we remand for a new trial on damages. The judgment in favor of Marbro on the City's breach of contract claim is affirmed and Marbro shall not be a party to the new trial on damages.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH INSTRUCTIONS.

---

24. Although the City calls to our attention the fact that the Pipe Defendants did not object to the verdict forms, we note that there is no indication that the City objected either. We consider the parties to be equally culpable for the ambiguity with which we now must contend.

25. The Pipe Defendants have not appealed the district court's decision not to convert the two punitive damages awards of $500,000 each into one joint and several award of $500,000. Indeed, the record is unclear as to whether they made a motion requesting such action. In any event, that award shall remain in effect and shall not be disturbed during the proceedings on remand. Nor shall the City be entitled to additional punitive damages.