**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

KAWTHER AL-ABOOD, individually
and on behalf of her minor son,
Mahmoud Al-Abood,
<u>Plaintiff-Appellant,</u>

v.

No. 99-1939

NIMAT MOHAMMED TAYEB EL-
SHAMARI, a/k/a Naimet Mohamed
Al-Hiwaiz; HISHAM ABDUL MALIK
EL-SHAMARI, d/b/a Midcorp
Associates,
<u>Defendants-Appellees.</u>

KAWTHER AL-ABOOD, individually
and on behalf of her minor son,
Mahmoud Al-Abood,
<u>Plaintiff-Appellee,</u>

v.

No. 99-1940

NIMAT MOHAMMED TAYEB EL-
SHAMARI, a/k/a Naimet Mohamed
Al-Hiwaiz; HISHAM ABDUL MALIK
EL-SHAMARI, d/b/a Midcorp
Associates,
<u>Defendants-Appellants.</u>

Appeals from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Gerald Bruce Lee, District Judge.
(CA-98-896-A)

Argued: April 6, 2000

Decided: June 30, 2000

Before WILKINS and MICHAEL, Circuit Judges, and
Patrick Michael DUFFY, United States District Judge
for the District of South Carolina,
sitting by designation.

---

Affirmed in part and vacated and remanded in part by published opinion. Judge Wilkins wrote the opinion, in which Judge Michael and
Judge Duffy joined.

---

**COUNSEL**

**ARGUED:** Bradford Allan Berenson, SIDLEY & AUSTIN, Washington, D.C., for Appellant. John G. Kester, WILLIAMS & CON
NOLLY, Washington, D.C., for Appellees. **ON BRIEF:** Jacqueline
Gerson Cooper, Edward R. McNicholas, Luisa Caro, SIDLEY &
AUSTIN, Washington, D.C., for Appellant. Dane H. Butswinkas,
Julie C. Hilden, Adam L. Perlman, WILLIAMS & CONNOLLY,
Washington, D.C., for Appellees.

---

**OPINION**

WILKINS, Circuit Judge:

In Kawther Al-Abood's action against former family friends Nimat
Mohammed Tayeb El-Shamari (Nimat) and her son Hisham Abdul
Malik El-Shamari (collectively, "the El-Shamaris"), the jury returned
verdicts in favor of Al-Abood on claims of fraud, breach of fiduciary
duty, and conversion, and awarded damages in excess of $2.5 million.
The district court granted judgment as a matter of law to the El-
Shamaris on four claims made by Al-Abood pursuant to the Racketeer
Influenced and Corrupt Organizations Act (RICO). See 18 U.S.C.A.
§ 1962 (West 1984 & Supp. 2000). Both parties appeal. For the reasons that follow, we affirm the jury verdicts as well as various actions
of the district court, but vacate and remand portions of the damage
award.

I.

The facts, viewed in the light most favorable to the verdict, are as follows. See State Auto. Mut. Ins. Co. v. Mitchell, 179 F.3d 590, 591 (8th Cir. 1999). Al-Abood is an Iraqi national who resides in Monaco. The El-Shamaris are also originally from Iraq but have become naturalized United States citizens; they reside in Virginia and do business as Midcorp Associates.

Al-Abood's late husband was a wealthy man named Shaker. He lent money to Nimat and invested in her business ventures. After Shaker's death in 1986, Nimat sought out Al-Abood's friendship, and over time the two became very close friends. Al-Abood, lacking in financial sophistication, came to trust Nimat, who has training and experience in money matters, and to rely on her for financial advice. For example, Al-Abood would sign documents that Nimat advised her to sign without independently reviewing them. The El-Shamaris abused Al-Abood's trust and carried out three discrete schemes to defraud her of significant sums of money. As a means of carrying out these schemes, Nimat obtained and misused powers of attorney.

The first scheme involved real estate fraud. The El-Shamaris induced Al-Abood to give them money to be invested in various real estate ventures. However, no real estate investments were ever made. Instead, the money was taken by the El-Shamaris for their own use. The El-Shamaris falsely represented to Al-Abood that profits from the real estate ventures were being deposited in a bank account for the benefit of Al-Abood's minor son.

A second fraudulent scheme, carried out solely by Nimat, concerned a charitable trust created by Shaker to benefit Iraqi students.[1] Nimat persuaded Al-Abood that Nimat had found a student worthy of

_____

[1] The trust to benefit Iraqi students was one of three funds within a larger trust at a foreign bank operating on the island of Jersey. The second fund was a family maintenance fund, primarily for Al-Abood and her minor son. The third fund was a capital fund which was to derive income and would largely be used to benefit the Al-Aboods' son later in his life. In the particular sort of trust Shaker established, the trustees had the authority to transfer monies between the three funds.

3

receiving funds from the charitable trust--a scientist named Dr. Hanaa Zainal who is actually employed by the U.S. Department of Agriculture and is a distant relative of Al-Abood. Al-Abood proposed Dr. Zainal as a candidate to the trust committee; based at least in part upon Al-Abood's recommendation, the committee agreed to send $2,000 per month to Zainal. Dr. Zainal never had any idea, until this suit was instituted, that she was a beneficiary of the trust. Nimat had told Dr. Zainal that Nimat needed to hide money from her spendthrift children, and persuaded Dr. Zainal to set up a bank account in her own name but over which Nimat had control (and which Dr. Zainal ignored). Nimat forged Dr. Zainal's signature on the required trust paperwork and took for herself, for several years, the monthly stipend that the trust deposited in the Zainal bank account.

The third fraudulent scheme involved a brokerage account. The El-Shamaris persuaded Al-Abood to create and invest in the account so that Hisham El-Shamari could gain experience managing such a fund. The El-Shamaris looted the account and hid their misdeed from Al-Abood by first telling her that the account had not yielded significant profits and later persuading her to transfer the money from the account to Midcorp Associates because an investment in the El-Shamaris' company would be more profitable.

Al-Abood filed this action in June 1998, alleging, inter alia, fraud, breach of fiduciary duty, and RICO violations. The El-Shamaris attempted to counterclaim based on their own version of the facts, but the counterclaims were dismissed as untimely.**2** At the close of the evidence, the district court granted the El-Shamaris' motion for judgment as a matter of law on the RICO claims. The remaining claims went to a jury, which found for Al-Abood on several counts and awarded several million dollars in damages.

In their counterclaims and at trial, the El-Shamaris forwarded a very different version of the history of the relationship between the families than did Al-Abood. They asserted that during a period of Iraqi currency restrictions in 1987, while they were still in Iraq, they

_____

**2** The district court held that the statute of limitations had not run on one minor counterclaim, but it is not clear from the Joint Appendix what became of that claim, nor is it relevant to the issues on appeal.

4

entrusted Al-Abood with approximately $2.5 million dollars to hold on their behalf. The El-Shamaris claimed that Al-Abood told them in the summer of 1993 that she had spent the money but that she promised to pay it back. They further contended that Al-Abood's lawsuit was an effort to avoid repaying the El-Shamaris.

The El-Shamaris filed suit against Al-Abood in Monaco in January 1998, asserting their claim of a looted trust. Through the Monacan and French courts, they attached certain of Al-Abood's property. However, the merits of the Monaco suit have not been adjudicated.

We conclude that the district court should be affirmed except with regard to two issues concerning the award of damages. We will first discuss the several allegations of error pressed by the El-Shamaris, and will then address Al-Abood's argument that the district court erred in granting judgment as a matter of law on the RICO claims.

II.

A.

The El-Shamaris contend that the district court lacked jurisdiction in this case on account of the Princess Lida doctrine. See Princess Lida of Thurn & Taxis v. Thompson, 305 U.S. 456, 465-66 (1939) [hereinafter Princess Lida]. They alternatively argue that the district court abused its discretion in declining to defer to the proceedings previously instituted in Monaco. See Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 817-20 (1976) [hereinafter Colorado River]. We affirm the district court in both respects.

According to the Princess Lida doctrine, a federal court may not exercise jurisdiction when granting the relief sought would require the court to control a particular property or res over which another court already has jurisdiction. See Princess Lida, 305 U.S. at 465-67; Dailey v. National Hockey League, 987 F.2d 172, 175-76 (3d Cir. 1993). In order for the Princess Lida doctrine to apply, the two courts must be exercising jurisdiction over the same res. See Dailey, 987 F.2d at 175-76. Therefore, the doctrine applies only to in rem or quasi in rem cases. See Donovan v. City of Dallas, 377 U.S. 408, 412 (1964); see

5

also, e.g., Southwestern Bank & Trust Co. v. Metcalf State Bank, 525 F.2d 140, 142-43 (10th Cir. 1975) (holding that Princess Lida doctrine did not apply in in personam action that did not in any way depend upon possession or control of the res over which the state court was exercising jurisdiction).

The El-Shamaris characterize this doctrine as one of subject matter jurisdiction. But see Carvel v. Thomas & Agnes Carvel Found., 188 F.3d 83, 86 (2d Cir. 1999) (holding that the Princess Lida doctrine is one of abstention, not of subject matter jurisdiction); Crawford v. Courtney, 451 F.2d 489, 492 (4th Cir. 1971) (characterizing the doctrine as relating to abstention). They therefore urge us to apply a de novo standard of review to this issue. See Anita's New Mex. Style Mexican Food, Inc. v. Anita's Mexican Foods Corp. , 201 F.3d 314, 316 (4th Cir. 2000). Assuming without deciding that the El-Shamaris' characterization is correct and that de novo review is appropriate, we agree with the district court that the Princess Lida doctrine does not apply.

The El-Shamaris argue that the Princess Lida doctrine should operate to deprive the United States courts of jurisdiction because this case involves the same res as that over which the Monacan court is presently exercising jurisdiction--the alleged $2.5 million trust. They assert that this case involves the administration of that trust essentially because their defense in this suit matches their claims in Monaco and Al-Abood's claims here are similar to her defenses in Monaco. The El-Shamaris further contend that the Princess Lida doctrine may apply to cases that are not formally labeled in rem or quasi in rem.

Even if the Monacan case does concern a trust res, the jurisdiction of the federal courts in this suit does not depend on or involve exercising jurisdiction over that res. This action is strictly for money damages, and does not involve any particular property or res. This case is not, in label or in fact, either in rem or quasi in rem. Therefore, the Princess Lida doctrine does not apply.

The district court was also correct not to abstain based on the Colorado River doctrine.**3** The basic notion underlying the Colorado River

_____

**3** Although not technically a doctrine of abstention, the Colorado River doctrine has become known as such and we "see no reason to revive" the distinction. Richmond, Fredericksburg & Potomac R.R. v. Forst, 4 F.3d 244, 253 n.20 (4th Cir. 1993).

6

doctrine is that in certain circumstances it may be appropriate for a federal court to refrain from exercising its jurisdiction to avoid duplicative litigation. See Colorado River, 424 U.S. at 817-19; Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 15-16 (1983). However, such abstention is the exception rather than the rule. See Colorado River, 424 U.S. at 817-18; Gordon v. Luksch, 887 F.2d 496, 497 (4th Cir. 1989). The threshold question in deciding whether Colorado River abstention is appropriate is whether there are parallel suits. See Romine v. Compuserve Corp., 160 F.3d 337, 339 (6th Cir. 1998); New Beckley Mining Corp. v. International Union, UMWA, 946 F.2d 1072, 1073 (4th Cir. 1991). If parallel suits exist, then a district court must carefully balance several factors,"with the balance heavily weighted in favor of the exercise of jurisdiction." Moses H. Cone Mem. Hosp., 460 U.S. at 16. These factors include, inter alia, the relative inconvenience of the federal forum, the relative order of the two suits, the source of law in the case, and the relative progress of the two proceedings. See Finova Capital Corp. v. Ryan Helicopters U.S.A., Inc., 180 F.3d 896, 898-99 (7th Cir. 1999); Romine, 160 F.3d at 340-41; McLaughlin v. United Va. Bank, 955 F.2d 930, 934-35 (4th Cir. 1992). We review the decision of the district court not to abstain for abuse of discretion. See New Beckley Mining , 946 F.2d at 1074.

The El-Shamaris argue that this suit is parallel to the Monacan suit because "each party's claims in one case were defenses in the other." Brief of Appellees and Cross-Appellants at 18. They further contend that the district court did not properly consider the relevant Colorado River abstention factors, and that had it done so it would have concluded that abstention was appropriate.

Suits are considered parallel "if substantially the same parties litigate substantially the same issues in different forums." New Beckley Mining, 946 F.2d at 1073. Here, although the parties in the two suits are substantially the same, the issues are not. In the Monacan proceeding, the central issues concern whether a trust was created and whether trust funds were confiscated by Al-Abood. In contrast, the central issues in this case concern whether the El-Shamaris were fiduciaries with regard to Al-Abood and whether the El-Shamaris committed fraudulent acts to bilk money from Al-Abood. Although the two proceedings have certain facts and arguments in common, the legal issues are not substantially the same. See McLaughlin, 955 F.2d

7

at 935 (stating that although the two actions involved similar claims and there were facts in common, the actions were not parallel because neither the parties nor the legal theories were the same); New Beckley Mining, 946 F.2d at 1074 (noting that "some factual overlap does not dictate that proceedings are parallel"). Because the district court correctly determined that these suits are not parallel, it had no duty to examine the various abstention factors.

B.

The El-Shamaris also appeal the dismissal of their counterclaims, in which they alleged breach of contract, breach of fiduciary duties, conversion, and fraudulent concealment, and sought an accounting. Al-Abood moved to dismiss the counterclaims pursuant to Federal Rule of Civil Procedure 12(b)(6), asserting that the claims were barred by the appropriate statutes of limitations. The district court conducted a hearing on the matter on a Friday and granted the motion in relevant part. After the district court announced its conclusion, the El-Shamaris requested ten days to amend their complaint, noting their belief that they could still amend once as of right because Al-Abood had not yet filed a responsive pleading. The district court allowed them the ten days. However, when the district court entered its written order later the same day, it stated that it had reconsidered its decision, vacated its ruling from the bench, and denied the motion to amend. The following Monday, Al-Abood filed a reply to the counterclaims.

The El-Shamaris first argue that the statutes of limitations had not run on any of the claims, in part because the applicable limitations periods should be equitably tolled against Al-Abood because her repeated promises to repay the entrusted funds lulled the El-Shamaris into not filing suit sooner. The El-Shamaris also contend that the district court violated the Federal Rules of Civil Procedure by effectively converting the Rule 12(b)(6) motion into a motion for summary judgment without affording them the necessary procedural safeguards, by deciding disputed matters of fact, and by disallowing an amendment of the counterclaim. We review de novo the decision of the district court to grant a motion to dismiss for failure to state claim upon which relief may be granted. See Mayes v. Rapoport, 198 F.3d 457, 460 (4th Cir. 1999). We review the denial of a motion to amend for

8

abuse of discretion. See United States v. Pittman, 209 F.3d 314, 316 (4th Cir. 2000).

Under Virginia law, a claim of injury to person or property accrues when the injury is sustained, and a cause of action for breach of contract occurs at the time of the breach. See Va. Code Ann. § 8.01-230 (Michie Supp. 1999). Generally, actions in Virginia do not accrue when the resulting damage is discovered. See id. There is an exception, however, for actions for fraud; a claim for fraud accrues when the fraud is or should have been discovered in the exercise of due diligence. See Va. Code Ann. § 8.01-249(1) (Michie Supp. 1999). We agree with the district court that all claims pled by the El-Shamaris accrued at or before the summer of 1993, when Al-Abood allegedly informed them that she had taken the money from the trust, because the alleged wrongdoing had occurred by then and the El-Shamaris obviously discovered the wrongdoing at that time. **4** Of the several claims pled, the longest applicable statute of limitations is five years for the conversion claim. See Va. Code Ann.§ 8.01-243(B) (Michie 1992); Bader v. Central Fidelity Bank, 427 S.E.2d 184, 187 (Va.

_____

**4** The El-Shamaris contend that the conversion counterclaim did not accrue until May 1995, when Al-Abood wrote a letter acknowledging that she would repay the trust money. We disagree. Assuming that such a letter exists, it does not alter the fact that the El-Shamaris were aware of the conversion in the summer of 1993. The El-Shamaris also maintain that the fraudulent concealment counterclaim did not accrue in the summer of 1993 because Al-Abood fraudulently concealed her lack of intent to repay the trust money until sometime in 1997. We again disagree, because the claim pled was that Al-Abood fraudulently concealed her unlawful theft of the trust funds, and the El-Shamaris knew of that conduct in the summer of 1993. Finally, the El-Shamaris contend that the breach of fiduciary duty claim did not accrue in the summer of 1993 because Al-Abood's statement that she had taken the trust money did not constitute a repudiation of the trust. See Broaddus v. Gresham, 26 S.E.2d 33, 36 (Va. 1943) (stating that "[i]t is well settled that so long as there has been no denial or repudiation of an express and continuing trust ... neither the statute of limitations nor laches will constitute a bar to an account or other proper relief"). We agree with the district court that Al-Abood's alleged action in looting the trust so clearly contravenes the fundamental notion of a trust and a trustee's duties that it is properly considered a repudiation.

1993). Because the El-Shamaris did not file their counterclaims until November 1998, the district court properly determined that they were not timely.**5**

The El-Shamaris argue that the limitations periods should have been equitably tolled because Al-Abood repeatedly promised to repay the entrusted funds. They also contend that the district court misapplied Virginia law when it treated concealment as necessary to the equitable tolling doctrine. Regardless of whether concealment is required to qualify for equitable tolling under Virginia law, cf. Luddeke v. Amana Refrigeration, Inc., 387 S.E.2d 502, 505 (Va. 1990) (stating that the elements necessary to establish equitable estoppel to assert a statute of limitations defense are "representation, reliance, a change of position, and detriment" (internal quotation marks omitted)), we conclude that the equities do not demand tolling here. Exceptions to the limitations periods are to be construed narrowly and apply only in extraordinary circumstances. See Westminster Investing Corp. v. Lamps Unlimited, Inc., 379 S.E.2d 316, 318 (Va. 1989). Because the El-Shamaris will have an opportunity to present their claims in the Monacan suit, fairness does not compel us to apply this extraordinary doctrine to allow the El-Shamaris to press their claims in American courts as well.

We also conclude that the district court committed no procedural errors with regard to the Rule 12(b)(6) dismissal or the denial of the motion to amend. The district court did not explicitly or implicitly convert Al-Abood's motion to dismiss into a motion for summary judgment because it did not consider matters outside the pleadings in reaching its decision. See Fed. R. Civ. P. 12(b). Nor did the district court resolve any matters of fact; it assumed the truth of all the El-

_____

**5** The El-Shamaris argue that the conversion counterclaim relates back to the date Al-Abood's complaint was filed. Because the conversion claim does not arise out of any of the transactions or occurrences upon which Al-Abood's complaint was based, we reject this argument. See Va. Code Ann. § 8.01-233(B) (Michie 1992). For the same reason, we reject their argument that the counterclaims were compulsory, see Fed. R. Civ. P. 13(a), and their challenge to the decision of the district court to strike their recoupment defense, see City of Richmond v. Chesapeake & Potomac Tel. Co., 140 S.E.2d 683, 687 (Va. 1965).

Shamaris' allegations and concluded that the counterclaims were untimely. Further, the El-Shamaris did not have a right to amend once the district court dismissed their counterclaims. See Sachs v. Snider, 631 F.2d 350, 351 (4th Cir. 1980) (per curiam). And, we conclude that the district court did not abuse its discretion when it denied the El-Shamaris' motion to amend for the reasons that the El-Shamaris were aware of all the facts supporting their counterclaims before the claims were filed and thus any facts not pled in the counterclaims could have been asserted; the suit pending in Monaco addresses the issues raised in the counterclaims; and the fact that the El-Shamaris had obtained new counsel was not cause to grant them leave to amend.

C.

After twice instructing the jury that Al-Abood bore the burden of proving her three claims of fraud by clear and convincing evidence, the district court gave the following instruction:

> If you find that a person acting under the authority of a power of attorney is involved in a transaction that benefits himself or herself, instead of benefiting the person who granted the power of attorney, you should presume that the transaction is fraudulent, unless the person acting under the power of attorney has proved to you by clear and convincing evidence that the transaction was not fraudulent.
>
> For example, if you find the defendants Nimat or Hisham El-Shamari used power[s] of attorney[ ] given to them by plaintiff Kawther Al-Abood to transfer money to themselves from the [brokerage] account, the law presumes that action to be fraudulent, and the burden is on the defendants to prove by clear and convincing evidence that Mrs. Al-Abood specifically authorized them to transfer that money to themselves.

J.A. 1311.

In Virginia, self-dealing by a fiduciary results in a presumption of

11

fraud.[6] See Economopoulos v. Kolaitis, 528 S.E.2d 714, 718 (Va. 2000); Oden v. Salch, 379 S.E.2d 346, 351 (Va. 1989). However, the El-Shamaris argue that the presumption should not apply here. They attempt to draw a distinction between claims of actual fraud and claims with no intent element, such as constructive fraud, and argue that the presumption applies only to the latter sort of claims. Because the fraud alleged here contains an intent element, see ITT Hartford Group, Inc. v. Virginia Fin. Assocs., Inc., 520 S.E.2d 355, 361 (Va. 1999), the El-Shamaris maintain that the instruction quoted above improperly placed the burden on them to disprove fraud. We review de novo the claim that jury instructions fail to correctly state the law. See Trimed, Inc. v. Sherwood Med. Co., 977 F.2d 885, 888 (4th Cir. 1992).

The clear purpose of the presumption described in the challenged instruction is to protect principals from disloyal fiduciaries. See Estate of Casey v. Commissioner, 948 F.2d 895, 899 (4th Cir. 1991). The need for such protection exists regardless of whether the claim pled includes an intent element. And, we are not aware of any controlling authority holding that this presumption applies only to claims that include an element of intent. Cf. Economopoulos , 528 S.E.2d at 718-19 (indicating, in case in which the only fraud claim was constructive fraud, that had a confidential relationship existed it would have been appropriate to apply the presumption); Bush Dev. Corp. v. Harbour Place Assocs., 632 F. Supp. 1359, 1368 (E.D. Va. 1986) (noting presumption in context of claim of fraud). Accordingly, we decline to assign error to this instruction.

D.

According to the verdict form, the jury awarded $235,640 in compensatory damages and $132,360 in "[i]nterest" for the brokerage-account fraud. J.A. 1447. The El-Shamaris contend that it was error for the district court to approve the interest award because it exceeds the nine percent cap on prejudgment interest set by Virginia statute. See Va. Code Ann. § 6.1-330.54 (Michie 1999). Al-Abood counters that the "interest" award is not actually prejudgment interest, but

_____

[6] A person acting under a power of attorney is a fiduciary. See Creasy v. Henderson, 173 S.E.2d 823, 827-28 (Va. 1970).

rather represents the estimated return that Al-Abood's money would have yielded had it actually been invested in the brokerage account.

At trial, Al-Abood presented expert testimony regarding compensatory damages for the various fraud schemes, including the brokerage-account fraud. The expert provided several possible damages figures. The expert calculated damage awards based on the sum of the original moneys Al-Abood intended to invest in the brokerage account plus a nine percent interest rate. The expert also calculated damage awards based on the sum of the original moneys intended to be invested plus an estimate of the return that the moneys would have yielded had they actually been invested.

The verdict form submitted to the jury, which the district court described during the jury charge as "self-explanatory," Trial Tr. Vol. 7 at 54, provided for each claim a line for compensatory damages, a line for punitive damages, and a line for "[i]nterest, if any," J.A. 1447-53. The district court instructed the jury that compensatory damages "seek to make the plaintiff whole, that is, to compensate her for the damage that she has suffered," Trial Tr. Vol. 7 at 48, and that its verdict "should be for such sum as will fully and fairly compensate the plaintiff for damages sustained as a result of the defendants' actions," id. at 49-50. The district court did not, however, provide any instruction to the jury regarding the "interest" line of the verdict form.[7]

Under these circumstances, we simply have no way of knowing what the jury intended when it awarded $132,360 in interest on the brokerage-account fraud. Perhaps the jury intended the figure to be interest in the strict sense, in which case the nine percent cap should have been applied by the district court.[8] On the other hand, as Al-

_____

[7] Under Virginia law, the award of prejudgment interest is a matter within the discretion of the jury. See Va. Code Ann. § 8.01-382 (Michie Supp. 1999); Dairyland Ins. Co. v. Douthat, 449 S.E.2d 799, 801 (Va. 1994).

[8] There is some indication in the record that the district court thought the award was permissible as an award of compounded interest at a rate of nine percent. However, Al-Abood's expert testified that applying a nine percent compounded rate of interest would yield only about $50,000.

13

Abood argues, the jury may have intended the amount to compensate Al-Abood for the rate of return she would have received had the El-Shamaris actually invested the money. In that case, the amount would actually be part of the compensatory damages award and the statutory limit on the rate of interest would not apply. Because the jury was not instructed on how to award interest, we simply have no way of resolving this issue.

We therefore vacate the award of compensatory damages and interest on the brokerage account fraud and remand for retrial solely to determine the amount of compensatory damages and interest for the brokerage-account fraud that should be awarded. See City of Richmond v. Madison Management Group, Inc., 918 F.2d 438, 461-62 (4th Cir. 1990) (remanding for retrial on issue of damages when original jury award was ambiguous).

E.

The jury awarded punitive damages in excess of $4 million. The district court was bound to reduce that amount pursuant to a Virginia statute:

> **Limitation on recovery of punitive damages. --** In any action accruing on or after July 1, 1988, ... the total amount awarded for punitive damages against all defendants found to be liable shall be determined by the trier of fact. In no event shall the total amount awarded for punitive damages exceed $350,000. The jury shall not be advised of the limitation prescribed by this section. However, if a jury returns a verdict for punitive damages in excess of the maximum amount specified in this section, the judge shall reduce the award and enter judgment for such damages in the maximum amount provided by this section.

Va. Code Ann. § 8.01-38.1 (Michie 1992) (emphasis added). The district court interpreted this provision as a per-defendant cap and accordingly lowered the punitive damages award to $700,000. The El-Shamaris contend that the cap applies per lawsuit and not per defendant, and therefore that the punitive damages award should have been lowered to $350,000. The proper application of this statute is a

14

question of law, and as such is subject to de novo review. See In re Brice, 188 F.3d 576, 577 (4th Cir. 1999).

We have not located any cases from Virginia addressing the issue pressed by the El-Shamaris. Al-Abood notes that in Advanced Marine Enterprises, Inc. v. PRC Inc., 501 S.E.2d 148 (Va. 1998), the Supreme Court of Virginia affirmed that portion of a circuit court decision in which the lower court had applied the punitive damage cap against each defendant. See Advanced Marine Enters., 501 S.E.2d at 154, 160. However, the defendants in that case had not raised the issue of whether the cap should be applied per defendant, and the opinion merely mentioned that aspect of the punitive damage award in its description of the case history. See id. at 154. There is at least one circuit court opinion that applied the statutory cap to the action as a whole rather than per defendant. See Huffman v. Beverly Calif. Corp., 42 Va. Cir. 205, 212 (Cir. Ct. Rockingham County 1997). Nothing in Huffman suggests, however, that the court was presented with the specific question of whether the cap applied to each defendant or to the action as a whole.**9**

We are therefore called upon to predict what the Supreme Court of Virginia would decide were the issue presented to it. See Doe v. Doe, 973 F.2d 237, 240 (4th Cir. 1992). We find no ambiguity in the instant statute and conclude that its plain meaning dictates that the cap on punitive damage awards applies to the action as a whole, and not

_____

**9** The El-Shamaris assert that three federal district court cases have held contrary to the district court here. The El-Shamaris overstate the holdings in two of the cases. The issue was presented but not reached in one unpublished federal district court case, see America Online, Inc. v. IMS, No. 98-0011-A, 1998 U.S. Dist. Lexis 20645, at *12 (E.D. Va. Dec. 30, 1998); and one unpublished federal district court opinion described the cap in dicta as an "aggregate against all defendants," America Online, Inc. v. Prime Data Sys., Inc., No. 97-1652-A, 1998 U.S. Dist. Lexis 20226, at *11 (E.D. Va. Nov. 20, 1998). Although in the third opinion cited by the El-Shamaris the court held that the cap applied to the action as a whole, Williams v. Nathan, No. 93-90-A, 1993 WL 219516, at *9 (E.D. Va. Mar. 19, 1993), there is again nothing to suggest that the Williams court was presented with the argument that the cap applied to each defendant.

15

to each defendant.**10** See Bray v. Brown, 521 S.E.2d 526, 527-28 (Va. 1999) (stating that courts in Virginia apply the plain meaning of an unambiguous statute). Because the first sentence in the statute refers to "the total amount awarded for punitive damages against all defendants," the reference in the second sentence to "the total amount awarded for punitive damages," absent any further clarification, must refer to the "total amount" discussed in the previous sentence. Further, even without the "against all defendants" phrase, the statute refers to the "total amount awarded" "[i]n any action." Giving this language its plain meaning, the statute mandates that the entirety of the punitive damages awarded in the action amount to no more than $350,000.

Accordingly, we vacate that portion of the order of the district court that applied the punitive damage cap to each defendant. On remand the district court should apply the cap to the action as a whole, thus awarding $350,000.

III.

Al-Abood appeals the grant of judgment as a matter of law on her RICO claims, contending that there was sufficient evidence from which a reasonable jury could have found a pattern of racketeering activity. We review this order of the district court de novo and must reverse unless we conclude, viewing the evidence in the light most favorable to Al-Abood, that no reasonable juror could have found for her on the RICO claims. See Taylor v. Virginia Union Univ., 193 F.3d 219, 230 (4th Cir. 1999) (en banc), cert. denied , 120 S. Ct. 1243 (2000).

RICO creates civil liability for persons who engage in "a pattern of racketeering activity." 18 U.S.C.A. § 1962, 1964 (West 1984 & Supp. 2000). "Racketeering activity" is defined as any of a number of predicate acts, including mail and wire fraud. See 18 U.S.C.A. § 1961(1)(B) (West Supp. 2000). A pattern of racketeering requires at least two predicate acts. See 18 U.S.C.A.§ 1961(5) (West 1984). However, simply proving two or more predicate acts is insufficient for a RICO plaintiff to succeed; instead, the RICO plaintiff must also

_____

**10** We express no opinion on how the cap would be applied in a case involving multiple plaintiffs.

16

show that the predicate acts are related and that they constitute or pose a threat of continued criminal activity. See H. J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 237-39 (1989).

Accordingly, it is possible for defendants to be guilty of RICO violations if they commit two or more acts of mail or wire fraud and the acts are sufficiently related and sufficiently continuous. See, e.g., Morley v. Cohen, 888 F.2d 1006, 1009-11 (4th Cir. 1989). However, we are cautious about basing a RICO claim on predicate acts of mail and wire fraud because "`[i]t will be the unusual fraud that does not enlist the mails and wires in its service at least twice.'" Anderson v. Foundation for Advancement, Educ. and Employment of Am. Indians, 155 F.3d 500, 506 (4th Cir. 1998) (quoting International Data Bank, Ltd. v. Zepkin, 812 F.2d 149, 154-55 (4th Cir. 1987)) (alteration in original). This caution is designed to preserve a distinction between ordinary or garden-variety fraud claims better prosecuted under state law and cases involving a more serious scope of activity. See id.; Midwest Grinding Co. v. Spitz, 976 F.2d 1016, 1022 (7th Cir. 1992). But see Annulli v. Panikkar, 200 F.3d 189, 199 (3d Cir. 1999) (stating that because RICO statute is to be read broadly, RICO "may be applicable to many garden variety fraud cases" (internal quotation marks omitted)). We have reserved RICO liability for "ongoing unlawful activities whose scope and persistence pose a special threat to social well-being." Menasco, Inc. v. Wasserman, 886 F.2d 681, 684 (4th Cir. 1989) (internal quotation marks omitted).

We conclude that this case is not sufficiently outside the heartland of fraud cases to warrant RICO treatment. The main predicate acts here were mail and wire fraud, and although they were related and involved three discrete schemes spanning several years, there was only one victim of the fraud.[11] There is no per se rule against a RICO claim involving only one victim. See Cosmos Forms Ltd. v. Guardian Life Ins. Co. of Am., 113 F.3d 308, 310 (2d Cir. 1997); Uniroyal Goodrich Tire Co. v. Mutual Trading Corp., 63 F.3d 516, 523-24 (7th Cir. 1995). However, the narrow focus of the scheme here--

_____

[11] Although there may also have been other, incidental predicate acts such as interstate transportation of the stolen money and bank fraud, we conclude that these acts do not transform the facts of this case into anything more than ordinary fraud.

17

essentially a dispute between formerly close family friends--combined with the commonplace predicate acts persuades us that the facts here do not satisfy the pattern requirement. See Anderson, 155 F.3d at 506 (holding that limited scheme to avoid paying compensation due under contract to single individual did not constitute a RICO violation); Menasco, 886 F.2d at 684-85 (holding that scheme to defraud only two victims did not constitute RICO violation but implying that claim alleging 27 victims of same scheme would suffice); Flip Mortgage Corp. v. McElhone, 841 F.2d 531, 538 (4th Cir. 1988) (holding that fraudulent scheme occurring over several years but impacting only one victim did not constitute RICO violation). In sum, even viewing all of the facts in the light most favorable to Al-Abood, we agree with the district court that this case does not involve a scope of unlawful activity that exceeds that found in customary fraud cases.

IV.

Accordingly, we affirm the jury verdicts as well as the various actions of the district court discussed above, but vacate and remand for a new trial on the issue of the proper amount of compensatory damages and interest that should be awarded on the brokerage-account fraud claim. We also vacate the award of punitive damages and direct the district court to reduce this award to $350,000.**12**

AFFIRMED IN PART, VACATED AND REMANDED IN PART

_____

**12** We deny the El-Shamaris' motion to strike a letter submitted to this court by Al-Abood pursuant to Federal Rule of Appellate Procedure 28(j).

18